Charles H. VOLZ, Jr., et al., etc., Plaintiffs-Appellants,

v.

LIBERTY MUTUAL INSURANCE COMPANY, INC., Defendant-Appellee.

No. 73-3044.

United States Court of Appeals, Fifth Circuit.

Aug. 12, 1974.

Rehearing and Rehearing En Banc Denied Oct. 16, 1974.

Roscoe B. Hogan, William W. Smith, John F. Kizer, Jr., Birmingham, Ala., for plaintiffs-appellants.

David B. Cauthen, Decatur, Ala., for Ala. Trial Lawyers Assn., amicus curiae.

Warren B. Lightfoot, John H. Morrow, Stanley D. Bynum, Birmingham, Ala., for defendant-appellee.

Before TUTTLE, COLEMAN and AINSWORTH, Circuit Judges.

COLEMAN, Circuit Judge.

This is an action to recover damages for an alleged interference with attorney-client contracts. The plaintiffs, Charles H. Volz, Jr., Leon M. Capouano, Charles H. Wampold, Jr., and Alvin T. Prestwood, are members of a Montgomery, Alabama, law firm. They claim that the defendant Liberty Mutual Insurance Company, a Massachusetts corporation, wrongfully induced Helen Sparks, Oscar Henderson, and Susie Henderson to sever an attorney-client contractual relationship with the plaintiffs. Liberty Mutual denied that a contract ever existed as to Helen Sparks. As to all "clients", it denied any tortious act.

Sitting without a jury, the District Judge accepted both defenses. He found no contract existed as to Helen. As to Oscar Henderson and Susie Henderson, he found that the actions of the defendant were not tortious under Alabama law. The factual findings are, of course, to be reviewed under the clearly erroneous rule, 52(a) F.R.Civ.P.

We affirm.

## I

### FACTS

Oscar Henderson and Susie Henderson are husband and wife. Helen Sparks is their married (widowed) daughter. On October 18, 1970, Susie Henderson, Helen Sparks, and Stella Sparks (another passenger) were riding in an automobile driven by James Sparks, Helen's husband. About eighteen miles north of Montgomery their automobile crashed into a truck which was blocking the highway. Both James and Stella were killed. Helen was rendered a quadriplegic. Susie Henderson's injuries were less ghastly and non-permanent, but nonetheless serious. The offending truck was insured by Liberty Mutual, up to $500,000. Liberty Mutual immediately began an effort to persuade the injured parties to settle their claims for personal injuries directly with it, in the obvious hope of cutting its loss.

Defendant's first steps to effect direct, company to individual, settlement were taken on October 19, 1970, the day after the accident. An agent of the defendant, Robert Dow, visited Oscar Henderson at the hospital. He presented Mr. Henderson with literature, appropriately called "The Persuader". As might be expected, it graphically illustrated the advantages of early settlement and the disadvantages of attorneys and law suits. Dow also offered to pay hospital and medical costs and Oscar Henderson accepted this offer. When Dow contacted Oscar Henderson on that day plaintiffs clearly had no attorney-client relationship with either the Henderson or Helen Sparks. They had not met the Hendersons or Helen Sparks.

The very next day, at the request of a relative who had been contacted by Mr. Henderson, Attorney Volz went to the hospital and secured a contingency fee contract of employment, signed only by Mr. Henderson. Mr. Henderson was not in the car, was not injured, but was the husband of one and the father of the other victim. Mrs. Henderson signed the contract on October 29. Helen Sparks never signed it.

Later, on the same day, the defendant learned of the alleged attorney-client relationship as the result of a chance meeting between Dow and Volz. This

occurred when both were inspecting the wreckage. Volz, at this meeting, explained to Dow that he had been employed to represent the Hendersons and Helen Sparks.

Still later, on the same day, Liberty Mutual's man, Dow, learned there was some question as to whether Helen was actually represented. During a visit with Oscar Henderson at the hospital, Dow confirmed that Helen was in intensive care and had not been in any condition to participate in the employment of an attorney. Additionally, Oscar Henderson specifically denied at the time that Helen was represented.

October 20, then, was the day when the defendant learned of a *probable* attorney-client relationship between Henderson and the plaintiffs and a *possible* attorney-client relationship between Helen Sparks and plaintiffs. Having this knowledge, defendant proceeded with its efforts to secure direct settlement with the injured parties. It never directly suggested that the attorneys be discharged or that settlement be made directly. Instead, through varied and imaginative measures, defendant tried to convince the injured parties that by reason of its solicitude their interests were being assiduously protected, so the attorneys were superfluous.

The procedure adopted by defendant may be briefly summarized as follows: It visited Helen Sparks five or six times during the first four weeks following the accident. It had flowers, books, and candy sent to the room occupied by Helen Sparks and Mrs. Henderson. It arranged hotel accomodations for persons who visited Helen. It paid Mrs. Henderson's medical and hospital bills. It persuaded Helen Sparks to enter its Boston rehabilitation clinic. It paid for a trip by Mr. and Mrs. Henderson to Boston to visit Helen. It paid for additions to the Henderson's home which were designed to make Helen more comfortable.

All this, done without the knowledge of the plaintiffs, say the plaintiffs, amounted to an actionable interference with their attorney-client contract.

In short, by October 29, plaintiffs undoubtedly had contingency fee contracts signed by the Hendersons. To prove that they also had established an attorney-client contract with Helen Sparks, they rely not only on the purported contract but upon several other events. One of the most significant of these occurred on November 13, 1970, when Volz and his associate, Al Sansone, went to the hospital to record Helen's statement. During the recording of the statement, the parties were interrupted on two occasions by hospital attendants, who were distributing the noon meal. On each occasion Volz or Sansone explained that they were the occupants' attorneys. On neither occasion did Helen deny the accuracy of the statement. Plaintiffs contend this evidence proves that Helen silently ratified Oscar's prior act of hiring the plaintiffs.

Just before plaintiffs left the Sparks-Henderson room, they requested that Helen sign a medical authorization form. Helen refused, saying she would have to talk with her father about it. Plaintiffs use this event as the basis of an argument that Helen held her father out as having apparent authority to act for her and is now estopped to deny that her father acted as her agent.

Defendant, on the other hand, points to a number of factual matters indicating there was never an attorney-client contract between Helen and plaintiffs; Helen herself has specifically denied either entering a contract with plaintiffs or authorizing her father to enter a contract on her behalf. Plaintiffs, while expediently returning to the hospital to get Mrs. Sparks' signature on the contract, never directly asked Helen whether she desired their services.

On March 15, 1971, at the Henderson home, Oscar Henderson told Volz that his services were no longer desired. Henderson confirmed Volz's discharge by letter; then by registered letter. The registered letter was sent on the ad-

vice of a Liberty Mutual agent, but this advice was sought by Henderson.

Volz eventually sent a release to the Hendersons and to Mrs. Sparks. The Hendersons signed it. Mrs. Sparks did not, claiming she had never hired an attorney.

By direct dealing with Liberty Mutual the Hendersons and Helen Sparks, in July of 1971, settled their claims. The Hendersons received $25,000; Helen Sparks received $232,000, plus $52,000 she had received in March for her husband's claim.

This suit for wrongful interference of contract was filed on August 30, 1971.

The allegation is that defendant, knowing of existing attorney-client contracts, proceeded to induce the breach of these contracts. This inducement, however, was not by misrepresentation, not by threats, and not by direct persuasion.

II

## THE HELEN SPARKS PHASE OF THE CASE

■ The District Court found, [App. 382]:

"I conclude that there was never a contract with Helen that was valid or which she had authorized or ratified, and that there was never any knowledge by the defendant of such a contract * * *."

Considered as a fact, this finding is strongly supported by the evidence and can, for no good reason, be held to be clearly erroneous. The direct evidence is that Helen never agreed that her father was to act for her in the employment of an attorney; there is no indirect evidence to the contrary.

Whether there was a ratification by silence was also a question of fact, Birmingham News Company v. Birmingham Printing Company, 209 Ala. 403, 96 So. 336, 341 (1923), and the trial judge found none.

It was further held that the plaintiffs had not established agency by estoppel, Pearson v. Agricultural Insurance Company of Watertown, New York, 247 Ala. 485, 25 So.2d 164 (1946), and we see no basis for a reversal on that issue.

In short, the plaintiff attorneys simply had no contract with Helen Sparks.

III

## MRS. HENDERSON'S CONTRACT

■ As to Mrs. Henderson, however, until it was revoked, the plaintiffs undoubtedly had a written, signed contract of employment. The case, then, is reduced to one question: Under Alabama law, did the conduct of Liberty Mutual amount to a tortious interference with that contract? The District Court found and concluded that it did not. Making no effort to conceal our general distaste for the uncommendable practice of attempting to deal directly with individuals who are known to be represented by counsel [a clearly unethical act if committed by attorneys], we are compelled, under the facts of this case, to agree that Alabama law dictated that result. This holding is limited to the underlying facts and is by no means intended to predict that insurance adjusters may, with impunity, ignore the presence of an attorney-client relationship.

We have already held that, because there was no existing contract, Liberty Mutual was well within its rights in dealing directly with Helen Sparks. In the absence of fraud, force, or coercion, any effect that this direct dealing might conceivably have on Mrs. Henderson was a hazard which the plaintiffs necessarily assumed when they had no contract with the daughter.

This remands us to a consideration of the dealings conducted directly with Mrs. Henderson. This consisted of sending flowers, books, and candy to a hospital room occupied by *both* of the ladies. The company paid Mrs. Henderson's medical and hospital bills, which it appears to have been clearly obligated to do. It paid for a trip made by Mrs. Henderson to Boston to see Helen. It paid for additions to the Henderson

home, which, however, would not have been needed had Helen not been there.

 We have independently reviewed every discoverable Alabama case dealing with tortuous interference with contracts. Our reserach leads us to conclude that in that jurisdiction there is no action for tortious interference with contract in the absence of fraud, force, or some form of coercion. See, e. g., Erswell v. Ford, 208 Ala. 101, 94 So. 67 (1922); Sparks v. McCrary, 156 Ala. 382, 47 So. 332 (1908); United States Fidelity and Guaranty Company v. Millonas, 206 Ala. 147, 89 So. 732 (1921); McCluskey v. Steele, 18 Ala.App. 31, 88 So. 367 (1920). But see, also, Alcazar Amusement Company v. Mudd & Colley Amusement Company, 204 Ala. 509, 86 So. 209 (1920), and Louisiana Oil Corporation v. Green, 230 Ala. 470, 161 So. 479 (1935), in which the latter case declared that the former was "not authoritative".

In its findings and conclusions, the District Court manifested its awareness of these standards. The record leaves us in no position to reverse.

The judgment of the District Court is Affirmed.