**Lawrence H. "Dude" HENNESSEY and Wendell Hudson, Plaintiffs-Appellants, Cross-Appellees,**

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an Unincorporated Association, Defendant-Appellee, Cross-Appellant.**

No. 76–3798.

United States Court of Appeals, Fifth Circuit.

Dec. 16, 1977.

1138

George R. Stuart, III, Birmingham, Ala., James S. Ward, Asst. Atty. Gen., Montgomery, Ala., for plaintiffs-appellants.

Harold A. Bowron, Jr., Birmingham, Ala., George H. Gangwere, Kansas City, Mo., for defendant-appellee.

Before GODBOLD, HILL and FAY, Circuit Judges.

PER CURIAM:

We affirm the judgment of the United States District Court for the Northern District of Alabama which was based upon the findings of fact and conclusions of law contained in the district court's Memorandum of Opinion which is reproduced here as an appendix.

AFFIRMED.

Appendix to follow.

APPENDIX

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
Western Division

LAWRENCE H. "DUDE" )
HENNESSEY and WENDELL
HUDSON, )

 Plaintiffs, )

 -vs.- ) No. CA 76-P-0799-W

 )

NATIONAL COLLEGIATE )
ATHLETIC ASSOCIATION, an
Unincorporated Association, )

 Defendant. )

## MEMORANDUM OF LAW

The NCAA is a non-profit association of some 800 public and private colleges, formed in part to adopt rules to govern the conduct of its member institutions in the administration of intercollegiate athletics. At a special convention in August 1975, the association adopted Bylaw 12–1 to limit, effective August 1, 1976, the maximum number of assistant football and basketball coaches certain[1] of the institutions could employ. Lest it possibly violate this bylaw and become subject to sanctions from the association, the University of Alabama[2], a voluntary member of the NCAA, made various adjustments in its employment relationships with several of its assistant coaches. As a part of these changes, Lawrence Hennessey, who had been an assistant football coach for sixteen years, and Wendell Hudson, who was in his second year as an assistant basketball coach, were reduced to the status of part-time coaches.[3]

In this action against NCAA, Hennessey and Hudson seek a ruling that Bylaw 12–1 is invalid or inapplicable, a decision which would permit their resumption of employment as full-time coaches. The plaintiffs' contentions are denied, both legally and factually, by the NCAA. Trial on the merits was conducted on August 30–31, 1976, with each side having the opportunity to present all evidence thought relevant to the issues.

## I. APPLICABILITY OF BYLAW

■ At the outset it must be determined whether Alabama, plaintiffs' employer, was unable to comply with the new limitations by reason of the number of coaches with "academic tenure, enforceable contracts or formal security of employment commitments in effect on August 15, 1975." If so, then the bylaw would by its terms be inapplicable until compliance should be possible through normal attrition.[4] The answer to

1. Bylaw 12–1 applies only to the 246 "Division I" members of the NCAA, of which 137 are "football" members of Division I. In general it can be said that Division I is composed of the athletically more prominent members of the association.

2. The University of Alabama will be referred to in this opinion simply as "Alabama" except where there may be a need to distinguish between the State and the University.

3. Hennessey suffered a reduction in basic compensation from $20,000 to $2,100 per year. Through assignment of other non-coaching duties, Hudson's basic compensation was not affected.

4. The bylaw defines normal attrition as death, retirement, voluntary resignation, discharge or transfer. The term would obviously also include expiration of the term of an enforceable contract or employment commitment.

this inquiry depends not merely on the employment status of the two plaintiffs, but also on that of the other assistant coaches.

When the bylaw was adopted, there were 14 assistant football coaches and 3 assistant basketball coaches employed on a full-time basis by Alabama, thus exceeding the number permitted under the bylaw of 8 and 2, respectively. Each of Alabama's assistant coaches had a written contract with the institution, most of them—including those of Hennessey and Hudson—being for a one year period of time. It was, however, customary that these contracts would be annually renewed during the tenure of the head football and basketball coaches. Indeed, during the periods of service of the present head coaches, 18 years and 8 years, respectively, not once—until the present controversy—did an interested assistant coach fail to have his contract renewed. This practice has been consistent with the verbal assurance given by the head coaches at the times of employing assistants.

The evidence presented to the court does not establish the existence of any enforceable contract on the part of the assistant coaches beyond the terms specified in their written agreements with the university. The assistants did not consider themselves or the university officials bound by any contractual undertaking except as specified in the written contracts. It was understood by all that the assurances of the head coaches were but personal pledges, not binding upon the university, which was willing to enter coaching contracts only for specific periods of time indicated by the written contracts.

■ The NCAA recommends to its members that a coach's contract "include the assignment of faculty rank, benefits of tenure and retirement and such other rights and privileges as are enjoyed by other members of the contracting institution's faculty." Alabama—and this is apparently true for many other NCAA members—has not chosen to confer formal tenure on its assistant coaches; nor can it be fairly said that the status of these assistants, while similar, is the equivalent of academic tenure. In reaching this conclusion, the court is mindful that there are great variations among—and even within—institutions in the granting and meaning of tenure.[5] Even so, one common characteristic stands out: that, with academic tenure, the institution is making a general commitment for employment which is normally expected to continue, with the individual's consent, until his death or retirement.[6] In the present case it is clear that any commitment to assistant coaches for continued employment would cease in the event of termination of employment of the head coach. This condition is in direct opposition to a fundamental feature of academic tenure, and precludes a finding that the Alabama assistants enjoyed even informal academic tenure under their arrangement with the institution.

■ The bylaw also speaks in terms of "formal security of employment commitments." That employment commitments were made by Alabama to its assistant coaches is clear. What is not so clear is the meaning of the words "formal security." The NCAA asserts that the commitment must have been in writing[7] and that the

---

**5.** See Commission on Academic Tenure in Higher Education, Faculty Tenure, p. 2. (1973).

**6.** According to the Commission on Academic Tenure in Higher Education, *op. cit., supra,* at 256, academic tenure may be generally defined as "an arrangement under which faculty appointments in an institution of higher education are continued until retirement for age or physical disability, subject to dismissal for adequate cause or unavoidable termination on account of financial exigency or change of institutional program." The term adequate cause refers "especially to demonstrated incompetency or

dishonesty in teaching or research, to substantial and manifest neglect of duty, and to personal conduct which substantially impairs the individual's fulfillment of his institutional responsibilities." These definitions follow in major respect those indicated in the 1940 Statement of Principles on Academic Freedom and Tenure, as drafted by the Association of American Colleges and the American Association of University Professors.

**7.** The NCAA Council has also concluded that, to suffice as an enforceable contract or academic tenure, there must be written documentation of that fact. While it is questionable

verbal understandings, such as those at Alabama between the head coaches and their assistants, are insufficient. This is not merely the interpretation of a party litigant. Rather, this is the official interpretation of the NCAA Council which, after its circulation to members in February, 1976, became binding upon the membership under the Association's Constitution. It is, moreover, an interpretation consistent with that given to the members at the Association's convention in January 1976, when votes were taken on amending Bylaw 12–1 in various respects. It would be inappropriate under the circumstances for the court to reject the association's interpretation of its own rule where that interpretation is certainly one of those reasonably suggested by the words of the bylaw.

In summary, the court finds and concludes that Alabama was not unable to comply with the requirements of Bylaw 12–1 by reason of the number of coaches with "academic tenure, enforceable contracts or formal security of employment commitments in effect on August 15, 1975."

## II. TORTIOUS INTERFERENCE WITH CONTRACT RIGHTS

■ Plaintiffs assert that the Bylaw, coupled with sanctions which could be imposed by the NCAA upon a non-complying member, amounts to a tortious interference with their contract rights. Ordinarily such a claim must be premised upon a valid contract, *Volz v. Liberty Mutual Insurance Co.*, 498 F.2d 659 (CA5 1974), and in this case the only contracts which the plaintiffs had—the written agreements for one year terms—were not affected by the Bylaw.

■ When dealing with employment relationships, however, the laws of this state do recognize a cause of action in cir-

cumstances where the terminated employee was without contract rights enforceable against his employer. *E. g., United States Fidelity & Guaranty Co. v. Millonas*, 206 Ala. 147, 89 So. 732 (1921). Indeed, the claim may be based upon interference with the securing of employment. See *Birmingham Broadcasting Co. v. Bell*, 259 Ala. 656, 68 So.2d 314 (1953).

■ Mere interference is not by itself sufficient. To be actionable, the interference must be—depending upon the particular opinion one reads—"wrongful", "malicious", "unlawful", or "unjustified". In the typical case, the defendant is charged with having pressured an employer into discharging its employee, the plaintiff, as a means by which the defendant sought to obtain something from the plaintiff (such as settlement of a claim) or as retaliation for some independent grievance which the defendant had against the plaintiff. And when the Court of Appeals holds that the interference must be accompanied by "fraud, force, or some form of coercion," [8] it should be understood that a third party's pressure upon an employer to discharge an employee does not suffice. Rather, the Fifth Circuit was referring to situations where the discharge was procured to force or coerce the employee to do some act. See, *e. g., Evans v. Swaim*, 245 Ala. 641, 18 So.2d 400 (1944); *Hill Grocery Co. v. Carroll*, 223 Ala. 376, 136 So. 789 (1931); *United States Fidelity & Guaranty Co. v. Millonas, supra.*

■ In the present case, the NCAA has no ill will or malice towards Hennessey or Hudson, nor does it seek anything from either of them. While it has exerted pressure, in the form of potential sanctions for noncompliance,[9] to force Alabama to reduce the total number of assistant coaches, it has done so simply as a matter of direct interest between itself and its member institutions.

---

whether such a requirement can be justified as an "interpretation" of the bylaw, such an issue is pretermitted here in view of the decision that no such enforceable contract or tenure was established by the evidence.

**8.** *Volz v. Liberty Mutual Insurance Co., supra,* 498 F.2d at 663.

**9.** The fact that Alabama, as a voluntary member, had the power to withdraw from the NCAA and then have as many assistant coaches as it desired is no answer to plaintiffs' claims. Indeed, in virtually all cases of tortious interference, the employer would have had the legal right to resist the pressure.

Its interference is not, under the circumstances, "tortious" as explicated in the decisions of this state.

### III. FOURTEENTH AMENDMENT CLAIMS

#### A. Applicability

The plaintiffs assert that, contrary to the Fourteenth Amendment and in turn 42 U.S.C. § 1983, they have been denied equal protection of the law and deprived of liberty or property without due process. An initial question here is whether the actions of the NCAA can be said to be "state action" or "action taken under the color of state law" so as to be within the ambit of these constitutional and statutory proscriptions.

On the surface it would appear that the activities of the NCAA, being a voluntary, non-profit, private association, are outside the scope of these provisions. Conceptually, however, the NCAA can be seen as composed of its constituent members, approximately half of which are, like the University of Alabama, public institutions endowed, in varying degrees, with the attributes of an instrumentality or agency of a state. See *Hutchinson v. Board of Trustees of the University of Alabama*, 47 Ala. App. 460, 256 So.2d 279 (1971); 1940 Code of Alabama, title 52, § 486, et seq. (Recomp. 1958). State participation in a nominally private activity can result in the characterization of that activity as "state action". *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

In any event, the Fifth Circuit has concluded that the NCAA's activities are the equivalent of state action for purposes of the Fourteenth Amendment and § 1983, and the critical facts in that determination are no different now than they were in the case then being considered. *Parish v. National Collegiate Athletic Ass'n*, 506 F.2d 1028 (CA5 1975). *Accord, Associated Students, Inc. v. N.C.A.A.*, 493 F.2d 1251 (CA9 1974). The practical effect of this holding is that Bylaw 12–1 is to be tested under the Fourteenth Amendment as if it were an enactment of a state legislature.

#### B. Equal Protection

Does the Bylaw have the effect of denying equal protection to Hennessey and Hudson? Yes, they say, because there is no compelling state interest to justify a classification which distinguishes between, on the one hand, assistant coaches who on August 15, 1974, had "academic tenure, enforceable contracts, or formal security, or employment commitments" and, on the other hand, assistant coaches who did not have that status on that date.

This court disagrees. The test applicable is the "minimum rationality" standard, in which the classification is to be upheld if it bears some rational relationship to some legitimate state purpose. *Cf. Parish v. National Collegiate Athletic Ass'n, supra.* The *Parish* case, to be sure, did not involve loss of employment, and indeed the parties in that case conceded that the actions of the NCAA did not affect "fundamental rights", such as claimed by the plaintiffs here. The reasoning, however, of the Fifth Circuit is applicable to the present case, for the classification in question neither discriminates against a "suspect class" nor impinges upon a "fundamental right". In this latter respect, a recent *per curiam* opinion of the Supreme Court implicitly holds that a person's interest in continuation of his occupation is not a "fundamental right" such as to trigger the "strict scrutiny" test. See *New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (upholding a city ordinance which closed certain businesses which had been in operation for less than eight years).

The Bylaw here in question was adopted by the defendant as an economy measure to benefit its member institutions, and the attempt to provide a grace period in circumstances where immediate compliance would be impossible or impracticable is certainly a legitimate state objective, particularly in view of the Constitutional mandate against any state law "impairing the

Obligation of Contracts." U.S.Const., art. 1, § 10. Indeed, the very arguments made by these plaintiffs as to the unfairness of the Bylaws in their circumstances demonstrate the legitimacy of some such distinction as made by the NCAA.

The particular classification chosen by the defendant to accomplish this purpose need not be perfectly suited nor perfectly fair—it need only be rationally related to that objective, and free from arbitrariness and invidious discrimination. It is of no moment that the court might in drafting such a bylaw have chosen to classify persons such as the plaintiffs in the exempt, rather than non-exempt classification. This was a decision for the defendant to make, and the court finds that decision to be rationally related to the purpose of the classification, a legitimate one, and finds that classification not to be arbitrary or invidiously discriminatory.

### C. Due Process

■ The requirements for procedural due process under the Fourteenth Amendment arise only when a person may be deprived of "life, liberty, or property" by the challenged state action. See, *e. g.*, *Thurston v. Dekle*, 531 F.2d 1264 (CA5 1976). Plaintiffs here contend that both their liberty and their property are so affected by the NCAA Bylaw.

"Liberty" in this context, has been said to include not merely freedom from bodily restraint, but also "the right of the individual to contract, to engage in any of the common occupations of life, . . . and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). More recently, the Supreme Court has held that, while the mere refusal by a governmental agency to renew an employee's contract would not suffice, yet under some circumstances that action might implicate interests in liberty.

*Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In *Roth* it was noted that such a conclusion might be reached if the employee's "good name, reputation, honor or integrity," was at stake or if the challenged state action "foreclosed his freedom to take advantage of other employment opportunities." 408 U.S. at 573, 92 S.Ct. at 2707.

The case *sub judice* does not involve any implication of misconduct or immorality on the part of the plaintiffs. The evidence is, however, convincing that the Bylaw has produced a surplus of assistant coaches for the reduced number of such positions now available. While the plaintiffs' opportunities for other "comparable"[10] employment have not been totally foreclosed, these opportunities have surely been adversely affected, to a substantial degree, by their replacement at a time when many other potential employers were likewise having to reduce or restrict their coaching positions. The chance for Hennessey, an older coach, to pursue his chosen occupation has been severely curtailed as a consequence of the Bylaw, and without any wrongdoing on his part or any dissatisfaction on the part of his employer.

■ The Supreme Court in *Roth* pretermitted any decision as to whether a "substantial adverse effect" upon other employment, when established by evidence, would constitute a restriction on liberty. 408 U.S. at 574, n. 13, 92 S.Ct. 2701. Nor need this court decide that question, for it concludes that the plaintiffs do meet the alternative test—a property interest. This is so even though, in the discussion regarding applicability of the Bylaw, the court has held that the plaintiffs did not have "academic tenure, enforceable contracts, or formal security of employment commitments."

As already noted, the understandings about plaintiffs' reemployment, being tied to continued employment of the head coaches, fell short of "academic tenure". Absent

---

**10.** The court rejects, as an unduly subjective self-imposed restriction, the plaintiffs' perception of comparable employment, which would disparage the significance of coaching positions at other than major college institutions.

any intent that the assurances by the head coaches would be binding upon the university, no contracts for renewal arose; nor would they, if held to be contracts, have been enforceable against the university under the Statute of Frauds. The commitments, not being in writing, were not evidenced by "formal security", as required by the NCAA for exemption from the Bylaw. These standards, however, do not fix the outer limits of a "property" interest as protected by the Fourteenth Amendment.

■ When hired, Hennessey and Hudson were assured that they would be annually offered reemployment during the tenure of their respective head coaches. These verbal pledges, periodically reiterated to them and their fellow assistant coaches, were in fact uniformly honored over many years. In the words of the *Roth* opinion, the plaintiffs under the circumstances had a "clearly implied promise of continued employment" during the tenure of the head coaches, and not merely some "abstract need or desire" or "unilateral expectation." 408 U.S. at 577, 92 S.Ct. 2701. Each plaintiff has by evidence established the existence of "understandings, promulgated and fostered by state officials, that . . . justify his legitimate claim of entitlement to continued employment 'absent sufficient cause.'" *Perry v. Sinderman*, 408 U.S. 593, 602–03, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972). *Sinderman* teaches that policies and practices of a particular university may, as here, constitute a "common law" of that institution, which gives rise to a property interest. It is not necessary, in order to constitute a constitutionally guarded property interest, that the commitment for continued employment be for the balance of the person's working life and hence be the equivalent of academic tenure—it is sufficient if the protection be afforded for some lesser period of time. See, *e. g., Roane v. Callisburg Independent School District*, 511 F.2d 633 (CA5 1975).

According to *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), following the implications of footnote 7 in *Sinderman*, 408 U.S. at 602, one is to look to state law to determine the dimensions of a claim of entitlement to job tenure. Under decisions of the State of Alabama, it appears that employees like the plaintiffs are deemed to have a property interest in continued employment, cognizable as against third parties even though no right might have been legally enforceable against the employer itself. *E. g., United States Fidelity & Guaranty Co. v. Millonas*, 206 Ala. 147, 89 So. 732 (1921); *Sparks v. McCreary*, 156 Ala. 382, 47 So. 332 (1908).

■ But have these property interests been impaired by the NCAA without affording due process of law? Typically in cases of this type the contention would be made that certain procedures should have been followed by the employer before and after its decision to terminate the plaintiff's employment. Here, however, plaintiffs do not attack the action taken by the University of Alabama in selecting them for termination. Rather, they sue only the NCAA, complaining, in the words of their trial brief, that they—Hennessey and Hudson—"were not able to participate in the debate" of the NCAA convention at which the Bylaw was adopted. (Plfts. Br., p. 20).

It will be noted that the due process argument is not directed at an executive or administrative action affecting plaintiffs individually,[11] but at a legislative action affecting numerous institutions and—though their identity could not then be known—individuals. The situation is comparable conceptually to a citizen whose property interests are ultimately affected by an act of the state legislature complaining that, although he might possibly have been so affected, he was not given notice of the proposed legislation and an opportunity to be heard on the floor of the legislative

---

**11.** Plaintiffs cite as authority for their contention the case of *Wright v. Arkansas Activities Ass'n*, 501 F.2d 25 (CA8 1974). While the AAA was a legislative body, the particular action there being challenged was one peculiarly directed against the plaintiff personally, not functionally different from an executive or administrative action against a particular individual. The *Wright* case is not applicable to the facts involved here.

body before a vote was taken. Presumably, to avoid such an attack, a state would be required to notify and give the privilege of debate to all persons who might be so affected. A statement of the problem in this context is sufficient to indicate the lack of merit in the plaintiffs' position.

This is not to say that the due process clause may not impose certain requirements upon the very procedures by which legislation is adopted. See Linde, *Due Process of Lawmaking*, 55 Neb.L.Rev. 197 (1976). But even so, there would surely be no obligation to provide potentially affected persons the privilege of debate, particularly where there are spokesmen espousing their cause who do have adequate notice and opportunity to be heard, as well as vote. The Bylaw in question was adopted only after months of study and deliberation, after weeks of notice, and after debate, amendment, and majority vote at a specially called convention. It was reconsidered by a subsequent convention of the NCAA several months later and again, in effect, approved. The internal procedures of the NCAA for adopting bylaws were duly followed; and, indeed, as a precaution, the constitution of the association was first amended, by greater than majority vote, to specifically authorize such a bylaw. The due process argument, assuming *arguendo* the plaintiffs' standing to raise the same, is wholly without merit.

## IV. ANTI-TRUST CLAIMS

Section 1[12] of the Sherman Anti-Trust Act prohibits "every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several states." 15 U.S.C. § 1. For violation of this proscription, the Clayton Act confers a private right of action, including, for a person "injured in his business or property", a right to recover treble damages. 15 U.S.C. §§ 15, 26. Simple in wording, these Acts nevertheless have provided the grist for many difficult and elusive legal concepts. Decisions involving anti-trust claims respecting various aspects of sports are, perhaps, more noteworthy for their number than for their logical consistency.

Before addressing the real issues in this case, the court should first dispose of several preliminary matters. It is fundamental that a single person or entity cannot by itself alone form a "contract, combination or conspiracy", and yet here the plaintiffs sue only the NCAA. Is this fatal? No, because conceptually the adoption and execution of the NCAA Bylaw can be seen as the agreement and concert of action of the various members of the association, as well as that of the association itself, and it is permissible to sue but one of several alleged co-conspirators. Indeed, it should be taken as undisputed that the defendant has been a party to a contract or combination—the question is whether that contract or combination constitutes a "restraint of trade or commerce among the several states" in violation of Section 1 of the Sherman Anti-Trust Act. In this context, it may be noted that the "voluntary" nature of the NCAA is likewise no answer to the plaintiffs' claims.[13]

### A. Plaintiffs' Standing

Do the plaintiffs—only employees of one of the member institutions against whom the Bylaw was enforceable—have "standing" to present anti-trust claims not merely for injunctive relief, but also for treble damages? The answer to this ques-

---

**12.** Plaintiffs here also allege a violation of 15 U.S.C. § 2; but the evidence is clearly insufficient to substantiate such a claim.

**13.** In *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 781–82, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), it was noted that purely advisory guidelines by a voluntary organization, without disciplinary sanctions and ineffective in fact, might be beyond the anti-trust proscriptions. In the present case—as was true in *Goldfarb*

—there are significant sanctions and pressures for compliance and in operation the Bylaw has been efficacious. As should be apparent from "tying" cases, the fact that a participant in an illegal contract or combination had the legal power to withdraw from the arrangement does not negate the violation or even prevent that party from itself bringing an appropriate action for damages.

tion is not necessarily the same as given in the earlier inquiry as to whether the plaintiffs had "property" interests protected by the Fourteenth Amendment. *Cf. Reibert v. Atlantic Richfield Co.,* 471 F.2d 727 (CA10 1973); *Karseal Corp. v. Richfield Oil Corp.,* 221 F.2d 358 (CA9 1955).

According to a recent Fifth Circuit decision, standing to bring the treble damage anti-trust claim depends upon proof that the plaintiffs (1) suffered injury to their "commercial interests or enterprises" and (2) were in the "target area" of the alleged conspiracy. *Tugboat, Inc. v. Mobile Towing Co.,* 534 F.2d 1172, (CA5 1976). Although reviewed on the basis of pleadings and not proof, the situation in *Tugboat* was quite similar to the case *sub judice*; and the Fifth Circuit, relying in part upon *Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), concluded that deprivation of work opportunities for employees would constitute an injury to their commercial interests and that the restraint in question was aimed at the employees as much as at their employer. Also see *Anderson v. Shipowners Ass'n,* 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298 (1926); *cf. Asbestos Workers v. United Contractors Ass'n,* 483 F.2d 384 (CA3 1973), *mod.* 494 F.2d 1353 (1974). Evidence in the present case is convincing that Hennessey and Hudson have the necessary standing for their antitrust claims under the standards specified in *Tugboat.* In making this determination with respect to plaintiffs' being in the "target area", the court assumes for the moment their characterization of the challenged Bylaw as an unlawful restraint.

### B. Educational Exemption

 The NCAA asserts that it is outside the ambit of the antitrust laws. In the words of the Supreme Court:

> "The end sought [by these laws] was the prevention of the restraints to free competition in businesses and commercial transactions . . . ." *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 493, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940).

> "The court in *Apex* recognized that the Act is aimed primarily at combinations having commercial objectives and is applied only to a very limited extent to organizations, like labor unions, which normally have other objectives." *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 213, n. 7, 79 S.Ct. 705, 710, 3 L.Ed.2d 741 (1959).

> "The proscriptions of the Act, tailored as they are for the business world, are not at all appropriate for application in the political area. * * * All of this caution [respecting legislation relating to political activities] would go for naught if we permitted an extension of the Sherman Act to regulate activities of that nature simply because those activities have a commercial impact . . . ." *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 141, 81 S.Ct. 523, 531, 5 L.Ed.2d 464 (1961).

And, according to the Court of Appeals for the District of Columbia,

> "[T]he proscriptions of the Sherman Act were 'tailored * * * for the business world,' not for the non-commercial aspects of the liberal arts and the learned professions. In these contexts, an incidental restraint of trade, absent an intent or purpose to affect the commercial aspects of the profession, is not sufficient to warrant application of the antitrust laws." *Marjorie Webster Jr. College v. Middle States Ass'n,* 432 F.2d 650, 654 (CADC 1970).

Therefore, says the NCAA, it—a voluntary, non-profit organization whose activities and objectives are educational and are carried out with respect to amateur athletics—is exempt from Section 1 of the Sherman Anti-Trust Act.

Prior to 1975 the vitality of this argument could hardly be doubted. A close reading, however, of the Supreme Court's decision in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), supports the view that such a blan-

ket exclusion cannot be accepted.[14] "Congress," the court stated, "intended to strike as broadly as it could in § 1 of the Sherman Act, and to read into it so wide an exemption as that urged on us would be at odds with that purpose." 421 U.S. at 787, 95 S.Ct. at 2013. Addressing the lawyers' claim of an exemption, the Court commented: "Whatever else it may be, the examination of a land title is a service; the exchange of such a service for money is 'commerce' in the most common usage of that word. It is no disparagement of the practice of law as a profession to acknowledge that it has this business aspect . ..." 421 U.S. at 787, 95 S.Ct. at 2013. Nor should it be taken as any attack upon the amateurism of intercollegiate athletics for one to acknowledge that there is a business aspect in the providing of coaching for the athletes or in the providing of athletic events to an interested public. The court holds that the NCAA is not entitled to a total exclusion from anti-trust regulations on this ground.[15]

### C. State Action Exemption

Alternatively, the NCAA contends that, as an unincorporated association composed in part of state institutions, it is entitled to the "state action" exemption recognized by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Also see *Saenz v. University Interscholastic League*, 487 F.2d 1026 (CA5 1973). Here again, however, the *Goldfarb* decision dictates rejection of the argument. Under *Goldfarb* the governmental character of the defendant is but one part of the "state action" exemption, and agencies such as cities are now subject to potential anti-trust claims. See *Lafayette v. La. Power & Light Co.*, 532 F.2d 431, (CA5 1976). The exemption also depends upon proof that the State as a sovereign, acting through its legislature, has "required" (in the words of *Goldfarb*) or "intended" (in the words of *Lafayette*) that the subordinate governmental agency do that act which is attacked under the anti-trust laws. Here it is clear that the laws of the State of Alabama do not require or intend, if indeed they even permit,[16] the University of Alabama to participate in a multi-university accord which limits the number of coaches. See 1940 Code of Alabama, tit. 52, § 492 (Recomp.1958).[17] Indeed, one may ask whether, to be entitled to the exemption, the NCAA would have to show that the Bylaw was adopted as a result of the votes of member institutions, each acting as directed or intended by their state legislatures. *Cf. Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). The NCAA is not entitled to the "state action" exemption from anti-trust regulation.

---

**14.** *Goldfarb*, to be sure, involved the claim of a "learned profession" on behalf of lawyers, who could hardly claim to have been engaged in a non-profit venture. The Court, moreover, did with apparent approval quote from an earlier decision to the effect that the Act was intended to cover persons "engaged in business." 421 U.S. at 788, 95 S.Ct. 2004. The rationale, however, should with equal force apply to the "liberal arts" exemption here claimed by the NCAA. While organized as a non-profit organization, the NCAA—and its member institutions—are, when presenting amateur athletics to a ticket-paying, television-buying public, engaged in a business venture of far greater magnitude than the vast majority of "profit-making" enterprises. The NCAA has a multi-million dollar annual budget; and it negotiates and administers for itself or its members television contracts exceeding, for all sports, over $20,-000,000 a year. The University of Alabama, just one of its members, has an athletic program which involves millions of dollars annual-

ly, and which has over the years, produced significant "profits" for use by non-athletic activities of the institution.

**15.** This does not mean that nature, purpose, and activities of the NCAA relied upon in the unsuccessful claim of an exemption may not have a bearing upon other issues, such as "interstate commerce" and "reasonableness". See *infra*.

**16.** As an alternative basis for relief, plaintiffs claim that the Bylaw contravenes state law with respect to decision-making on the hiring of faculty. The court concludes that this theory cannot be decided in the context of a case by these plaintiffs against the NCAA.

**17.** There is no evidence—or legislative facts subject to judicial notice—as to the legislative intent of this statute. *Cf. Lafayette v. La. Power & Light Co.*, *supra*, 532 F.2d 435 n. 9.

## D. Interstate Commerce

Section 1 of the Sherman Anti-Trust Act only proscribes a "restraint of trade or commerce among the several states." The NCAA, emphasizing that it is a non-profit educational association, denies that it is guilty of any such restraint. This position is similar to, but not identical with, its unsuccessful claim of an exemption from the Act based, in part, upon the same facts. Answers to the two contentions need not be the same in order to be consistent.

Several perspectives have, depending upon the circumstances, been adopted by the courts in analyzing interstate commerce under Section 1. Some cases have focused upon the nature of the defendant's business—whether that business constitutes "trade or commerce among the several states." *E. g., U. S. v. International Boxing Club*, 348 U.S. 236, 240, 75 S.Ct. 259, 261, 99 L.Ed. 290 (1955); *Radovich v. National Football League*, 352 U.S. 445, 453, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957). Others—and this approach seems more in tune with the words of Section 1—have concentrated upon the effect of the restraint upon interstate commerce. *E. g., Apex Hosiery Co. v. Leader*, 310 U.S. 469, 485, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). *Cf. U. S. v. American Building Maintenance Industries*, 422 U.S. 271, 278, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975) (Clayton Act); *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 194–95, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974) (Clayton Act). In evaluating that effect, the amount—absolutely or relatively—of interstate commerce so affected or restrained is not important provided it is not insubstantial. See, *e. g., United States v. Yellow Cab Co.*, 332 U.S. 218, 225–26, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

Intercollegiate athletic competition, both in events sponsored by the NCAA and in games arranged by its member institutions, involves to a great degree teams from different states. In its Division I basketball championship for 1974–75, the NCAA conducted tournaments in the States of Alabama, Arizona, California, Kentucky, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Texas, and Washington, for which it received over $1,000,000 from the sale of tickets and over $2,500,000 from the sale of television rights.[18] Almost $1,700,000 was realized "in profit" by the NCAA from this championship, constituting more than half its general income—which for that year exceeded its expenses by more than $500,000. In addition, the NCAA was during that year distributing approximately $2,065,000 to its members who had teams competing in various events. For 1976, the NCAA has negotiated and is administering television contracts for football games which will result in some $17,300,000 to member institutions and almost $700,000 for itself. Although no evidence was offered as to the amount of sales of tickets, radio rights, etc. realized directly by the 800-odd members of the NCAA in the conduct of their athletic programs, it was shown that just one, the University of Alabama, has an annual athletic budget running into the millions of dollars and is yet realizing a "profit" from the program for infusion into other activities of the institution. While the participating athletics may be amateurs, intercollegiate athletics in its management is clearly business, and big business at that. Nor does it disparage the educational objectives either of the NCAA itself or of its members to acknowledge that they are significantly involved in interstate commerce in the conduct of the athletic programs.

■ The providing of coaching to the athletes is an integral part of the conduct of these programs. See *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 783–85, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). Moreover, while the major part of these services is "local", being performed at the site of the particular institution, a significant portion

---

18. The sale of television rights may alone suffice to meet the commerce requirements of Section 1. See *Radovich v. National Football League*, 352 U.S. 445, 453, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *U. S. v. International Boxing Club*, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955).

is also performed by travelling to other states where competitive events are held. *Cf. United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). While a restriction on the number of assistant coaches, such as contained in the Bylaw, may not impair the conduct of intercollegiate athletics, it will certainly curtail the extent of coaching services which previously flowed from one state to another. It is also true that the employment market for collegiate coaches is multi-state, if not national, and that the Bylaw has the effect of reducing the movement of coaches between institutions located in different states. The court concludes that the Bylaw does have sufficient impact upon interstate commerce as to come within Section 1 of the Sherman Anti-Trust Act.

### E. Reasonableness

 Although Section 1 of the Sherman Anti-Trust Act proscribes "every" combination in restraint of interstate commerce, the courts have limited the Act to "unreasonable" restraints. See *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). This condition, however, may be met either because a restraint otherwise reasonable is accompanied with a specific intent to accomplish a forbidden restraint or because it falls within the class of restraints that are considered to be illegal *per se*. See *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

Plaintiffs view the Bylaw as a "group boycott" and therefore *per se* illegal. See *Fashion Originators' Guild v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). The "group boycott" cases typically have involved situations where there was some concerted refusal to deal with persons or companies because of some characteristic of those persons and companies.[19] Here, the participants in the combination—the colleges—remain free to deal with any of the persons in the "target group"—the assistant coaches. The restriction rather depends upon a particular attribute of the participants themselves; namely, how many assistant coaches they have. The situation is perhaps more clearly analogous to a "division of markets" among conspirators, which has also held to be a *per se* violation. See *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). Inasmuch as the schools would be free to change their assistant coaches, provided the maximum number was not exceeded, the Bylaw has a marked similarity to an agreement for allocation of "market shares." *Cf. Addyston Pipe & Steel Co. v. U. S.*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); *U. S. v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).

Where a restraint is of a type classified as a *per se* violation, efforts to find special circumstances which justify use of the "rule of reason" have generally been unsuccessful. See, *e. g.*, *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, (CA5 1976); *Copper Liquor Inc. v. Adolph Coors Co.*, 506 F.2d 934 (CA5 1975). But *cf. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.* 416 F.2d 71 (CA9 1969).

 Nevertheless—and with some trepidation in view of such cases—this court concludes that under the particular circumstances here involved the restraint in question should be viewed under a "rule of reason", and not automatically condemned as a *per se* violation. This conclusion is at least suggested by a footnote in the recent *Goldfarb* opinion:

"The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint

19. For example in the recent unreported opinion of *Smith v. Pro-Football*, D.C.D.C., 420 F.Supp. 738 (1976), Judge Bryant held the "player selection draft" of the National Football League to be a group boycott and *per se* illegal. Under the draft system, the participants in the combination agreed not to negotiate for the services of any player selected by other participants. Also see *Mackey v. National Football League*, 407 F.Supp. 1000 (Minn. 1975) (the "Rozelle Rule", which may subject one team to liability to another when hiring former player of the latter, is a group boycott and *per se* illegal).

violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the profession antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could be properly viewed as a violation of the Sherman Act in another context, be treated differently. We intimate no view on any other situation than the one with which we are confronted today. 421 U.S. at 787–88, n. 17, 95 S.Ct. at 2013."

While this court has declined to grant the NCAA and its members a total exemption from the antitrust laws, it does believe that, given the nature and purposes of the NCAA and its member institutions, this particular restraint, limiting the number of assistant coaches who may be employed at any one time by the institutions, is not a *per se* violation of the antitrust laws.

This conclusion finds support in those cases previously cited with respect to the NCAA's claim of a blanket exemption.[20] See *Apex Hosiery Co. v. Leader, supra; Klor's Inc. v. Broadway-Hales Stores, Inc., supra; Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra; Marjorie Webster Jr. College v. Middle States Ass'n, supra.* The "Call" rule of the Chicago Board of Trade was clearly "price fixing" and yet was, under the circumstances, not *per se* illegal, the Court stating,

"But the legality of an agreement or regulation cannot be determined by so simple a test as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competition. To determine that question

the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable. The history of the restrain, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation, or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences." *Board of Trade v. U. S.,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

And, in *White Motor Co. v. U. S.,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 938 (1963), the Court, faced with a new situation, said,

"A vertical territorial limitation may or may not have that purpose or effect [stifling of competition]. We do not know enough of the economic and business stuff out of which these arrangements emerge to be certain. They may be too dangerous to sanction or they may be allowable protections against aggressive competitors or the only practicable means a small company has for breaking into or staying in business * * * and within the 'rule of reason.'" 372 U.S. at 263, 83 S.Ct. at 702.

Thus, group boycotts whose purpose was to protect fair competition in sports and games have, on occasion, been tested under the "rule of reason", rather than under *pro se* standards. See *Bridge Corporation of America v. American Contract Bridge League, Inc.,* 428 F.2d 1365 (CA9 1970); *Deesen v. Professional Golfers' Ass'n,* 358 F.2d 165 (CA9 1966). A similar approach has been taken with respect to an action by the NCAA itself which although having obvious impact upon the business interests of the plaintiff, was viewed as motivated by a desire to protect the academic standards

---

**20.** It should be acknowledged that a state trial court, confronted with the same question under a state law patterned after the Sherman Anti-Trust Act, has reached the contrary conclusion with respect to this Bylaw. See *Board of Regents v. NCAA,* Okla.Co.Dist.Ct. # CD 76–871 (unreported dec.).

of the member institutions. See *College Athletic Placement Service v. NCAA*, 1975 Trade Cases ¶ 60,117 (N.J.1974), *aff'd*, 506 F.2d 1050 (CA3 1974). Similarly, regulations by non-profit organizations to further the purposes of those organizations have been viewed for reasonableness, rather than under the *per se* tests. See *Nankin Hospital v. Michigan Hospital Services*, 361 F.Supp. 1199 (E.D.Mich.1972); *Roofire Alarm Co. v. Royal Indemnity Co.*, 202 F.Supp. 166 (E.D.Tenn.1962), *aff'd* 313 F.2d 635 (CA6 1963).

The record in this case is devoid of any evidence that adoption of the Bylaw was prompted by an intent to injure Hennessey, Hudson, or other assistant coaches, either individually or as a group. There was, to be sure, an awareness by the members of the association that there would be some adversely affected by the Bylaw, but the attitude expressed was one of concern, not indifference. The granting of a grace period in circumstances of academic tenure, enforceable contracts, and formal employment commitments can be seen as an effort to accommodate to the more compelling of such situations.

The Bylaw was adopted after a lengthy study of problems facing many members of the association in their attempt to conduct intercollegiate athletic programs as a part of—and consistent with—the educational objectives of these member institutions. A goal of the NCAA, one which is endowed with certain benefits to society, is to "retain a clear line of demarcation between college athletics and professional sports." Colleges with more successful programs, both competitively and economically, were seen as taking advantage of their success by expanding their programs, to the ultimate detriment of the whole system of intercollegiate athletics. Financial pressures upon many members, not merely to "catch up", but to "keep up", were beginning to threaten both the competitive, and the amateur, nature of the programs, leading quite possibly to abandonment by many. "Minor" and "minority" sports were viewed as imperiled by concentration upon the "money makers", such as varsity football and basketball.

Bylaw 12–1 was, with other rules adopted at the same time, intended to be an "economy measure". In this sense it was both in design and effect one having commercial impact. But the fundamental objective in mind was to preserve and foster competition in intercollegiate athletics—by curtailing, as it were, potentially monopolistic practices by the more powerful—and to reorient the programs into their traditional role as amateur sports operating as part of the educational processes.

 The motive which underlies a challenged restraint is but one element in the examination for reasonableness. See *Copper Liquor Inc. v. Adolph Coors Co.*, 506 F.2d 934, 945 n. 6 (CA5 1975). Additionally, one should consider the relative positive and negative effects, the power of the parties in the markets they serve, and whether other less restrictive means could be employed to achieve the same desired ends.

 The ultimate effects of the Bylaw, positive and negative, are difficult to determine on the basis of evidence taken just a month after its effective date. It is possible, of course, that a consequence of the Bylaw will be to stabilize, if not depress, the compensation which any assistant coach can obtain for his services, and thereby have an adverse impact not just on those displaced, such as Hennessey and Hudson, but on all such persons. It is also possible that the Bylaw will not contribute at all to its intended objectives and have no "positive" effects.

The court is not prepared to accept either such hypothesis, but is rather of the view—admittedly bordering on speculation—that the Bylaw will be of value in achieving the ends sought by the association and will have in time lesser, not greater, adverse effect upon assistant coaches than that already experienced. One may argue that the burden of proof in this respect should be upon the NCAA, to establish reasonableness, rather than upon the plaintiffs, to establish the contrary; and there is language in the case law to support such a contention. However, the result of that

approach would be to foreclose, by way of injunction, any opportunity to build up experience on which the issue could ultimately be judged. If actual experience under the Bylaw should run counter to the NCAA's expectations, such evidence would be available to a court evaluating the reasonableness of the restraint in a subsequent case.

There are, or will be, a not insignificant number of assistant coaches displaced or reduced, like Hennessey and Hudson, by the Bylaw.[21] However, the effects upon them are not likely to be as severe or prolonged, except perhaps with respect to a few older coaches such as Hennessey, as suggested by plaintiffs. There are, indeed, many opportunities for coaches to pursue their vocations in addition to those now partially limited with Division I members of the NCAA: colleges which are in other divisions of the NCAA; colleges which are not in the NCAA; professional teams; and high schools. While these opportunities may not be as rewarding, either financially or emotionally, to many coaches, the fact of their existence must be taken into account in measuring the "market power" of the NCAA Division I teams and the economic effects of the rule.

The long-range consequences of the Bylaw—at least if the fears of the NCAA have some justification—may indeed be to benefit assistant coaches by preserving the number of institutions which remain as potential employers of such coaches. Moreover, one should not consider just the position of the assistant coaches—the public and the athletes themselves have a potential interest in the continuation of the extensive athletic programs on the college level.

Would some less restrictive measure suffice to accomplish the aims of the NCAA in this respect? The NCAA, acting through its member institutions after much study, concluded in the negative. The evidence supports that decision. The plaintiffs suggest only that (1) the grace period could have been extended to themselves as well as to those with academic tenure, etc., or (2) a more efficient method would have been to fix a maximum amount which a school could pay its assistant coaches, regardless of the number. The grace period, however, in this context should be seen not as supporting the objective of the Bylaw, but as a counter-productive measure justified by other considerations—and to further extend those provisions would add more delay in achieving the goals of the Bylaw. Nor can the court view a limitation of compensation of employees as less a restraint than one which limits the total number of employees.

The court is of the opinion that the Bylaw must be measured under Section 1 of the Sherman Anti-Trust Act by the "rule of reason" standard and that, so evaluated, it is not an unreasonable restraint.

## V. CONCLUSION

The plaintiffs come close, but fall short, on each of the theories advanced. By separate order filed herewith, judgment is entered in favor of the defendant.

This the __27th__ day of September, 1976.

S/ Sam C. Pointer, Jr.
United States District
Judge

---

**21.** The exact number so affected is not known. Plaintiffs' expert concluded that the number of assistant coaches employed at Division I football institutions in 1975 exceeded by 111 the number of positions at such schools under the Bylaw. This is not a reliable estimate of the actual number affected in view of the built-in "grade" period and of the effects of normal attrition.