**Janice P. STEWART, Plaintiff,**

v.

**RUTGERS, The State University, Joseph J. Seneca, Chair, Promotion and Review Committee, Francis L. Lawrence, President, Rutgers University, Defendants.**

**Civil Action No. 95–4373 (AJL).**

United States District Court,
D. New Jersey.

May 10, 1996.

Michael H. Sussman, Goshen, New York, John P. Brennan, Jr., Spring Lake Heights, New Jersey, for Plaintiff.

Irving L. Hurwitz, David E. Schwartz, Carpenter, Bennett & Morrissey, Newark, New Jersey, for Defendants.

## OPINION

LECHNER, District Judge

This is an action by Janice P. Stewart ("Stewart") against Rutgers, the State Uni-

versity of New Jersey ("Rutgers"), Joseph J. Seneca ("Seneca"), chair, promotion and review committee ("PRC") and Francis L. Lawrence ("Lawrence"), president of Rutgers (collectively, the "Defendants"). Jurisdiction is asserted pursuant to 28 U.S.C. §§ 1331 and 1343. Stewart has filed suit because she contends she was denied tenure ("Tenure").

Currently before the court is a motion for summary judgment filed by the Defendants (the "Motion for Summary Judgment"), pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.[1] For the reasons set forth below, the Motion for Summary Judgment is granted.

*Facts* [2]

### A. *Parties and Individuals Involved*

Rutgers is "the state university of New Jersey." N.J.S.A. § 18A:65–3. Lawrence is the president of Rutgers. Defendants' Rule 12G Statement at 1. Seneca is vice-president of Rutgers for academic affairs. *Id.* The Board of Governors (the "Board") has supervisory authority over Rutgers and makes decisions regarding promotions of faculty members. *Id.* (citing N.J.S.A. § 18A:65–25).

Jean L. Ambrose has been assistant vice-president for faculty affairs at Rutgers since November 1986. Ambrose Aff., ¶ 1. Prior to that time, she was associate dean of the Graduate School–Newark. *Id.* In 1985, Stewart joined the Rutgers faculty as an assistant professor in the Graduate School of Education, Department of Learning and Teaching (the "Department"). Defendants' Rule 12G Statement at 5. Stewart has fo-

cused her research and writing on literacy development in early childhood, including "strategies for educating low-income, minority children." Plaintiffs' Rule 12G Statement at 1–2 (citations and internal quotations omitted); Ambrose Aff., Ex. F.

Anthony E. Kelly ("Kelly"), who is caucasian, was promoted from assistant to associate professor and received Tenure during the 1994–95 academic year, also in the Department. Defendants' Rule 12G Statement at 15; Moving Brief at 1. Michael W. Smith ("Smith"), another caucasian member of the Department, was Tenured during the 1994–95 academic year. Defendants' Rule 12G Statement at 19; Moving Brief at 1.

### B. *Background*

#### 1. *The Rutgers Tenure Evaluation Process*

The scholarship, teaching and service of an assistant professor are considered in deciding whether to grant Tenure. Ex. A (University Policy with Respect to Academic Appointments and Promotions (the "Policy")) to Ambrose Aff. at 1; Plaintiffs' Rule 12G Statement at 2–3; Defendants' Rule 12G Statement at 1. The parties dispute the extent to which promotion involves subjective and objective factors. Moving Brief at 9–10; Opposition Brief at 4–8; Reply Brief at 6–8. The Policy provides in relevant part:

> Informed judgments concerning a faculty member's accomplishments can be made only by qualified colleagues. Such *subjective* judgment by persons competent to

**1.** Stewart submitted: Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment ("Opposition Brief"); Statement of Facts as to Which A Genuine Issue Exists Pursuant to General Rule 12G ("Plaintiffs' Rule 12G Statement"); Affidavit of Michael H. Sussman attaching exhibits.

Defendants submitted: Brief in Support of Defendants' Motion for Summary Judgment ("Moving Brief"); Defendants' General Rule 12G Statement of Material Facts As To Which No Genuine Dispute Exists ("Defendants' Rule 12G Statement"); Reply Brief in Support of Defendants' Motion for Summary Judgment ("Reply Brief"); Affidavit of Francis L. Lawrence ("Lawrence Aff."); Affidavit of Irving L. Hurwitz ("Hurwitz Aff.") attaching exhibits; Affidavit of

Jean L. Ambrose ("Ambrose Aff.") attaching exhibits.

Although the caption heading to the Plaintiffs' Rule 12G Statement suggests the facts discussed within are *disputed*, that document also refers to facts which do not appear to be in dispute. Because the Plaintiffs' Rule 12G Statement does not clearly delineate between disputed and undisputed facts, it will be cited only where it refers to facts that are clearly not in dispute or where it cites to deposition testimony.

**2.** The facts have been summarized and considered in a manner most favorable to Stewart, granting her the benefit of all reasonable inferences. *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir.1995).

evaluate duties, responsibilities, services, and accomplishments will protect the interest of professors themselves, the department, the college, the University, and the students better than any *objective* rating that could be devised.

Ex. A (Policy) to Ambrose Aff. at 4–5 (emphasis added); *see* Seneca Dep. at 67–70.

Stewart was denied Tenure based upon evaluations of her scholarship. Defendants' Rule 12G Statement at 1 n. 2 (citing Seneca Dep. at 41–43, 48, 69–70). Several factors are considered to measure scholarship, including peer evaluations, research, presentation of papers, fellowship awards and publication of books and articles. *Id.*; Plaintiffs' Rule 12G Statement at 3. Seneca states no single factor is dispositive in the evaluation of a candidate's scholarship. Plaintiffs' Rule 12G Statement at 3 (citing Seneca Dep. at 74–76).

The 1994–95 Academic Reappointment/Promotion Instructions ("1994–95 Instructions") describe the process for applying for Tenure. Ex. C (1994–95 Instructions)[3] to Ambrose Aff. To apply for Tenure, a candidate must first prepare a description of his or her qualifications, including scholarly accomplishments, a document known as Form 1–a ("Form 1–a"). Defendants' Rule 12G Statement at 2 (citing 1994–95 Instructions at 4–14). Form 1–a, along with "supplementary materials submitted by the candidate, if any," confidential letters of recommendation and other evaluation forms comprise a document known as a promotion packet ("Promotion Packet"). *Id.* at 2–3.

Tenured members of a candidate's department first evaluate the Promotion Packet and produce a report, reflecting the majority and minority views on the substance of the candidate's application. Defendants' Rule 12G Statement at 3 (citing 1994–95 Instructions at 9). The appointments and promotions committee ("A & P Committee"), also composed of faculty members at the

candidate's institution, evaluates the Promotion Packet and provides a written recommendation to the Dean. *Id.* (citing 1994–95 Instructions at 12). The Dean considers the evaluations of the Tenured members of the candidate's department and the A & P Committee and makes an independent recommendation. *Id.* The PRC, chaired by the vice-president of Rutgers for academic affairs—in this case, Seneca—plays a role in the Tenure process. *Id.* at 4. The PRC is charged with guarding the integrity of the Tenure review process by ensuring that evaluations of a candidate have been made by leaders in their academic fields and that "appropriate evidence and analysis have been presented of accomplishment and impact on the field to support these judgments, and that the dean has applied the highest, University-wide standards of quality." *Id.* (quoting 1994–95 Instructions at 13). The chair of the PRC serves without vote. *Id.* "Finally, the [PRC] has the responsibility on the basis of its assessment of these matters, to reach a recommendation concerning the candidate." *Id.* The PRC reviews each candidate independently, without making comparisons with the credentials of other candidates. *Id.* (citing Seneca Dep. at 24). The PRC then submits a report to the president of Rutgers—in this case, Lawrence—who reviews the materials and submits a recommendation to the Board. The Board decides whether to grant or deny Tenure. *Id.* (citing 1994–95 Instructions at 14).

From the 1990–91 academic year to the 1994–95 academic year, Rutgers considered 368 faculty members for Tenure. Of these, 238 faculty members were Tenured, a success rate of sixty-five percent. Defendants' Rule 12G Statement at 2 n. 3 (citing Ambrose Aff., ¶ 3). Stewart represents that, while employed at Rutgers, no African–American received Tenure in the Department, although another African–American faculty member was hired with Tenure from another institution. Plaintiffs' Rule 12G Statement at 2 (citing Stewart Dep. at 332–33). She also represents that there were no African–Amer-

---

**3.** Stewart applied for Tenure during the 1992–93 academic year and again, during the 1994–95 academic year. Defendants represent that the 1992–93 Academic Reappointment/Promotion Instructions ("1992–93 Instructions") are "essentially the same" as the 1994–95 Instructions. Defendants' Rule 12G Statement at 3 n. 5 (citing Ex. B (1992–93 Instructions) to Ambrose Aff.).

ican members of the PRC between 1992 and 1995, the time during which she was considered for Tenure. *Id.* at 9 (citing Seneca Dep. at 70). Stewart states there has not been a Tenured African–American member of the Department for at least twenty years. Stewart Dep. at 332.

### 2. *Stewart's 1992–93 Evaluation for Tenure*

Stewart first applied for Tenure during the 1992–93 academic year. Her Promotion Packet (the "Stewart 1992–93 Promotion Packet") then contained evaluations by nine individuals, each a faculty member at a university other than Rutgers. Defendants' Rule 12G Statement at 5. "All the [outside evaluators] are leading scholars in [Stewart's] field at highly respected public institutions. They include seven professors, many of whom are nationally prominent and two associate professors." Ex. F (Stewart 1992–93 Promotion Packet) to Ambrose Aff. at 81 (conclusions of Acting Dean Nobuo K. Shimahara ("Shimahara")). The evaluations are summarized below.

A professor at the University of Georgia, who judged Stewart's scholarship "by quality and quantity of publications," concluded: "I would have thought that a person at [Stewart's] level would have developed her ideas more fully in *published* work. In short, she has chosen a very interesting area in which to work but has not, as of yet, published a systematic account of her research in this area." Ex. F (Stewart 1992–93 Promotion Packet) to Ambrose Aff. at 26 (emphasis in original).

A professor at Ohio State University described Stewart's work as "cutting edge" and stated Stewart "has made a substantial contribution in the area of early literacy research." Ex. F (Stewart 1992–93 Promotion Packet) to Ambrose Aff. at 29. He concluded:

> Characteristics such as energy, drive, curiosity and knowledgeable (sic) distinguish [Stewart] from the majority of her counterparts at other institutions. She has amassed a history of scholarship evidenced in the quality of her published articles and submissions to date. Moreover, she has

the necessary background, curiosity and drive to continue to make substantial contributions. She has earned a reputation of trustworthiness, commitment, integrity and collegiality.

*Id.* at 30.

A professor at Boston University concluded "there appears to be some coherence and integrity to [Stewart's] scholarly activity," and indicated Stewart worked as a graduate student with Jana Mason ("Mason"). Mason is a distinguished academic in the field of early literacy research, which has been the focus of Stewart's scholarship. Ex. F (Stewart 1992–93 Promotion Packet) to Ambrose Aff. at 33. This assessment indicated Stewart had co-authored several articles, on which she was second author, and had just begun to produce articles as a first or sole author. *Id.*

An associate professor at the University of Georgia gave Stewart a positive review, concluding that Stewart's "scholarship has given her national prominence as a researcher in the area of literacy development in young children." Ex. F (Stewart 1992–93 Promotion Packet) to Ambrose Aff. at 37. Another professor at Ohio State University concluded Stewart had become a prolific writer and gave her a favorable review for the quality, quantity and originality of her work. *Id.* at 40–41.

A professor at the University of Colorado at Boulder indicated Stewart had published one article in a journal, five chapters in edited volumes and nine technical reports. As well, three of Stewart's articles were then under review by journals and one was being revised and resubmitted to *Reading Research Quarterly*, a "first-tier" journal. Ex. F (Stewart 1992–93 Promotion Packet) to Ambrose Aff. at 43. "[W]ith the addition of the *Reading Research Quarterly* piece and one additional acceptance of the three journal articles out for review, [Stewart] has proven the ability to conduct an independent and ongoing line of research." *Id.* at 44.

A professor emeritus at the University of Auckland, New Zealand wrote about Stewart's work; she indicated she had heard Stewart speak at a seminar. She described Stewart's work as "exciting, innovative and

at the cutting edge...." Ex. F (Stewart 1992–93 Promotion Packet) to Ambrose Aff. at 46. A professor and dean at the University of Illinois indicated Stewart's "research portfolio merits strong consideration for promotion to a position as a tenured associate professor." *Id.* at 49. An associate professor at the University of Michigan concluded:

> In summary, when I compare [Stewart's] past record of achievements with other scholars who are at the same time in their careers, I would say that she is between the second and third quartile; however, if I base my evaluation on the promise which seems inherent in her work, I would give a more hearty endorsement.

Ex. F (Stewart 1992–93 Promotion Packet) to Ambrose Aff. at 52.

The Department evaluated Stewart's 1992–93 Promotion Packet and recommended, by a vote of eleven to one, that she receive Tenure. Defendant's Rule 12G Statement at 7. The Department concluded, however, that Stewart had not "'fully demonstrated peer acceptance and recognition of her work,'" had only recently developed "an 'independent line of research'" because most of her work was co-authored or multiple-authored and also concluded "there was not 'definitive evidence that [Stewart's] scholarly activities have attained the peer acceptance that is indicated by publications in refereed[4] journals.'" *Id.* at 8 (quoting Ex. F (Stewart 1992–93 Promotion Packet) to Ambrose Aff. at 69–76).

The A & P Committee recommended against granting Stewart tenure by a vote of two to one, concluding that "[w]hile [Stewart] is not a strong candidate for promotion at Rutgers, she has demonstrated the potential for being a productive and nationally visible scholar." Ex. F (Stewart 1992–93 Promotion Packet) to Ambrose Aff. at 79.

Shimahara recommended Stewart for Tenure, observing that seven of nine reviews, as summarized, "speak of Professor Stewart's scholarship in very high terms." Ex. F (Stewart 1992–93 Promotion Packet) to Ambrose Aff. at 81. He also observed that Stewart had published one article "in a leading national journal," had written five book chapters as a co-author and authored or co-authored twelve technical reports. Ex. F (Stewart 1992–93 Promotion Packet) to Ambrose Aff. at 82–83. Shimahara also indicated Stewart then had four manuscripts under review, two of which she had revised and had good odds of being published.

> The fact that she has co-authored most of her articles, reports, and book chapters and published one refereed article to date, seems disturbing. But it should be reiterated that her contributions are broadly recognized by senior scholars in the field across the nation as 'substantial' and representing the 'cutting edge' in the field of young children's literacy. It is the quality of her research that earns such respect.

*Id.* at 82.

On 29 March 1993 (the "29 March 1993 Letter"), Seneca, writing for the PRC to Lawrence, recommended Stewart be denied Tenure:

> Professor Stewart is an able teacher, appreciated by her colleagues and students. She has established an excellent record of participation in professional organizations and University activities. Professor Stewart's scholarly record has been evaluated by reviewers as promising, but several note a lack of substantive contributions. The independence and quality of her work are questioned by some evaluators. The [PRC], therefore, concludes that, based on the assessment of her record, Professor Stewart has not achieved a level of scholarly accomplishment to justify promotion to the rank of Associate Professor with tenure.

Ex. F (Stewart 1992–93 Promotion Packet) to Ambrose Aff. at 84. Lawrence reviewed the Stewart 1992–93 Promotion Packet and concurred in the decision of the PRC. He so informed the Board. Defendant's Rule 12G Statement at 9 (citing Lawrence Aff., ¶ 2). By letter, dated 2 April 1993, Shimahara

---

4. Work must be evaluated by an author's peers in the field before it can be published in a refereed journal. For this reason, publication in a refereed journal is considered more significant than publication in a non-refereed journal. *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 175 n. 11 (3d Cir.1991), *cert. denied*, 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992).

informed Stewart that the Board declined to grant her Tenure. *Id.*

### 3. *Stewart's 1993 Grievance Filing*

Rutgers has an agreement (the "Agreement") with the American Association of University Professors (the "AAUP") which provides for a grievance procedure "to help ensure the integrity of the reappointment, promotion, and tenure procedures; to provide a process for determining whether evaluations resulting in negative personnel actions were flawed ... and to provide remedies in cases where defects are found." Ex. E (Agreement) to Ambrose Aff. at 28. Under the Agreement, an aggrieved faculty member may contest a decision on grounds it was arbitrary or capricious, was the product of procedural violations, discrimination, enmity or was materially inconsistent with the facts set out in the relevant Promotion Packet. *Id.*

On 1 October 1993, Stewart filed a grievance concerning the decision denying her a promotion and Tenure (the "First Grievance"). Ex. B (First Grievance) to Hurwitz Aff. at Bates no. 529. She alleged the PRC "committed a material factual error" in concluding " *'several* [reviewers] note a lack of substantive contributions. The independence and quality of her work are questioned by *some* evaluators.' " *Id.* at Bates no. 530 (quoting 29 March 1993 Letter) (emphasis added by Stewart). Stewart further alleged the decision to deny her Tenure was arbitrary and capricious, criticizing the report of the A & P Committee. *Id.* at Bates no. 531. She also alleged procedural violations by the A & P Committee, Shimahara, the PRC and others. *Id.* at Bates No. 532–37. Finally, Stewart alleged racial and gender discrimination and violation of a Rutgers policy concerning affirmative action, by the PRC, the A & P Committee, Shimahara, the Department and its chair. *Id.* at Bates No. 538–41.

On 28 February 1994, a grievance committee (the "Grievance Committee") reached a decision regarding the First Grievance (the "First Grievance Decision"). The Grievance Committee, comprised of Professors Jack L. Nelson, William McCullough and Michael Gordon, modified the First Grievance Decision on 27 April 1994. The Grievance Committee concluded the report of the PRC contained a "material factual inconsistency," citing the PRC's conclusions that Stewart's research lacked independence and that " 'several [evaluators] note a lack of substantive contributions' " by Stewart. Ex. C (First Grievance Decision) to Hurwitz Aff. at Bates no. 103. "External letters, departmental narratives, and the Dean's statement show stronger scholarly work than the PRC narrative recognized." *Id.*

The Grievance Committee recommended Stewart's application be remanded to the PRC "for full reevaluation, with the opportunity for the candidate to update relevant information before remand." Ex. C (First Grievance Decision) to Hurwitz Aff. at Bates no. 103. The Grievance Committee also determined that the PRC had made an arbitrary and capricious decision that "could not have been reached by reasonable evaluators," for which it recommended the same remedy.[5] *Id.*

The Grievance Committee concluded "[t]here was no apparent pattern of racial or sexual discrimination," although it determined "[t]he PRC should more carefully examine the very positive attributes of [Stewart], as her record shows, and should review her work in the interest of furthering the University's commitment to affirmative action." Ex. C (First Grievance Decision) to Hurwitz Aff. at Bates no. 106.

Attached to the First Grievance Decision is a statement by neutral readers of the Promotion Packet (the "Statement"), which concluded the report of the PRC was "not fully accurate on three points." *Id.* at Bates no. 108. "The [PRC] did not reflect the fact that six of the nine outside letters, including let-

---

**5.** The Grievance Committee also concluded there were material and non-material procedural irregularities in the evaluation of Stewart for Tenure. Ex. B (First Grievance Decision) to Hurwitz Aff. at Bates no. 103–05. The Grievance Committee recommended Stewart's application be remanded to the Department, the PRC and A & P Committee and Stewart be permitted to recommend "external referees to speak to her co-authorship and research independence...." *Id.* at Bates no. 105.

ters written by nationally recognized leaders in the field, spoke of Professor Stewart's work as considerably more than simply 'promising.'" *Id.* The Statement continued:

> (2) The PRC evaluation concluded that "several" reviewers noted Professor Stewart's "lack of substantive contributions" to relevant scholarship. We feel this evaluation is misleading because it does not make clear that two-thirds of the outside reviewers were highly positive in their direct judgment of Professor Stewart's written material. One reviewer, a renown expert in the field, also emphasized that Professor Stewart's research time available for writing may have been unfairly limited by the type of courses she was asked to teach during her pre-tenure years.

> (3) The PRC evaluation states that "some" evaluators questioned the "independence and quality of her work." While it is true that some evaluators from Rutgers did make this judgment, we found no evidence of this opinion regarding the independence or quality of Stewart's work in any of the nine letters written by outside reviewers.

*Id.* at Bates no. 108.

### 4. *Stewart's 1994–95 Evaluation for Tenure*

Because of the First Grievance Decision, Stewart received a remanded evaluation for promotion, based upon the Promotion Packet. Stewart was also permitted to revise her Promotion Packet (the "Stewart 1994–95 Promotion Packet") and to submit to the Department chair a list of additional commentators to write confidential evaluation letters on her behalf. Ex. G (Stewart 1994–95 Promotion Packet) to Ambrose Aff. at Bates no. 101A.

Six individuals outside of Rutgers submitted evaluations. A professor at the University of North Carolina provided a favorable review of Stewart's work, stating it has a "programmatic and coherent nature" and a "thematic continuity . . . not often characteristic of the work of assistant professors." Ex. G (Stewart 1994–95 Promotion Packet) to Ambrose Aff. at 59. This evaluation concluded:

> In sum, relative to others in comparable positions in the discipline nationally and internationally, Dr. Stewart has accomplished a great deal—and on many fronts. She is recognized in the professorial community as well as in the public school teaching community as a child advocate and as a researcher and scholarly authority in early literacy education.

*Id.* at 60.

An associate professor at Portland State University evaluated Stewart's work, indicating Stewart had achieved a national reputation. "At my institution, she would exceed the requirements in all categories for promotion to associate professor and we would be pleased and proud to have her on our faculty." Ex. G (Stewart 1994–95 Promotion Packet) to Ambrose Aff. at 63.

A professor and director of the Center for the Study of Reading at the University of Illinois indicated "Stewart is an authority in the field of children's emergent literacy." Ex. G (Stewart 1994–95 Promotion Packet) to Ambrose Aff. at 65. This professor compared Stewart's work with that of her colleagues, and ranked her "in the middle." *Id.* at 66. He concluded: "Based on my experience with about two hundred promotion decisions, I believe that Stewart would be promoted if she were being considered at the University of Illinois." *Id.* at 66.

Mason, also of the University of Illinois, evaluated Stewart's work, viewing her work "very favorably in comparison to her colleagues across the nation and internationally." Ex. G (Stewart 1994–95 Promotion Packet) to Ambrose Aff. at 68. She opined that Stewart had made significant contributions to her field and devoted the remainder of her evaluation to discussing specific works authored by Stewart, variously describing them as "accurate," "important," and as "a gigantic effort." *Id.* at 68–69.

An associate professor at Temple University gave Stewart's work an unfavorable review. Productivity was the first of her criteria; she observed that, in six years, Stewart had published three articles as first author, in journals she rated as "mediocre" and "not research-oriented." Ex. G (Stewart 1994–95 Promotion Packet) to Ambrose Aff. at 71.

Second, this evaluation concluded that Stewart's research "has some serious flaws," including dated citations and "weak" methodology. *Id.* at 71–72. Third, she did "not see any originality, or theoretical framework underlying the research." *Id.* at 72. Finally, the evaluation concluded other academics in Stewart's field did not recognize her work, because she had not found citations to Stewart's materials in other work. *Id.* "Although it is painful to write such a negative evaluation, I do not believe, based on the materials provided for review, that Professor Stewart's materials represent a good match for [Rutgers]." *Id.* at 73.

A distinguished professor at the City University of New York evaluated Stewart's work. She indicated she had served on several promotion committees while a faculty member of the University of California at Davis and considered annual publication of at least two articles in well-regarded journals as the "rule of thumb" for promotion. Ex. G (Stewart 1994–95 Promotion Packet) to Ambrose Aff. at 75. She observed that, in eight years, Stewart published three journal articles as sole author, a book chapter as a first author, four book chapters as a second or third author and several "tech reports, a commentary, and two published assessment instruments." *Id.* On the quantity of her work, this evaluation concluded Stewart was "productive," although "not overwhelming." *Id.* The evaluation discussed the focus of Stewart's work, concluding she "has much to say about literacy events involving preschoolers and beginning readers and many helpful suggestions to offer teachers." *Id.* at 76.

In a report, dated 28 October 1994, the Department recommended Stewart be promoted to associate professor with Tenure. Two faculty members rated her scholarship "outstanding," seven rated it "above average" and two rated it "average." Hurwitz Aff., ex. E. The Department, however, expressed concern with Stewart's "limited number of publications in refereed journals," echoing the conclusions of some of the outside evaluators, although it acknowledged a "significant increase in productivity on the part of Dr. Stewart since 1991." Ex. G (Stewart 1994–95 Promotion Packet) to Ambrose Aff. at 82.

The Department unanimously recommends Dr. Stewart for promotion and [T]enure. Our consensus is that she is a productive scholar, a good teacher, and a responsible colleague; thus, she is a valuable addition to [the D]epartment and to the [Graduate School of Education] as a whole.

*Id.* at 84.

In a report, dated 5 December 1994, the A & P Committee observed that, of fifteen outside evaluations, fourteen "were essentially supportive and one was decidedly negative." Ex. G (Stewart 1994–95 Promotion Packet) to Ambrose Aff. at 91. After discussing the substance of the negative evaluation, particularly the conclusion that Stewart's citations were dated, the A & P Committee decided not to credit that evaluation. *Id.* at 91–92. Concerning Stewart's scholarship, the A & P Committee concluded "the output, though somewhat limited, has generally been assessed favorably by outside reviewers." *Id.* at 93.

In a report, dated 20 December 1994, Dean Louise C. Wilkinson ("Wilkinson") recommended Stewart receive Tenure and a promotion to associate professor, observing "the external reviewers were virtually in agreement that Stewart's work merits her promotion" and "[t]he evidence supports a rating of above average in the area of scholarship." Ex. G (Stewart 1994–95 Promotion Packet) to Ambrose Aff. at 88.

On 17 May 1995 (the "17 May 1995 Letter"), Seneca, writing for the PRC to Lawrence, recommended Stewart be denied tenure:

Professor Stewart has an average record of teaching as evidenced by student evaluations and the testimony of colleagues. Her service to the profession, the University and the community has been outstanding and highly valued. In the area of scholarship, however, Professor Stewart has not established a record of substantial, independent productivity. Her work, while generally regarded favorably, is limited and has not been recognized by significant external, peer-reviewed support, nor has it demonstrated substantial national impact on developments in her field. The [PRC], therefore, concludes that, based on the as-

sessment of her record, Professor Stewart has not achieved a level of scholarly accomplishment to justify promotion to the rank of Associate Professor with [T]enure.

Ex. G (Stewart 1994–95 Promotion Packet) to Ambrose Aff. at Bates no. 101.

Lawrence reviewed the 1994–95 Promotion Packet and concurred in the PRC's decision to deny Stewart tenure. He so informed the Board. Defendant's Rule 12G Statement at 13–14 (citing Lawrence Aff., ¶ 3). By letter, dated 13 June 1995, Shimahara informed Stewart that the Board declined to grant her Tenure. *Id.* at 14 (citing Hurwitz Aff., ex. D).

### 5. *Stewart's 1995 Grievance Filing*

On 19 June 1995, Stewart filed another grievance (the "Second Grievance"). Ex. E (Second Grievance) to Hurwitz Aff. at Bates no. 633. She alleged the PRC "committed material factual errors," asserting the PRC's statement that "Professor Stewart has an average record of teaching as evidenced by student evaluations and the testimony of colleagues" was at odds with the conclusions of the Department. *Id.* at Bates no. 634. Stewart also took issue with the statement by the PRC that her work "has not established a record of substantial, independent productivity" and has "not been recognized by significant external, peer-reviewed support, nor has it demonstrated substantial national impact on developments in her field." *Id.* Stewart asserted this statement was inconsistent with the report of the Department, which had credited the comments of external evaluators concerning "her national and international visibility . . . ." *Id.*

Stewart further criticized the report of the PRC as arbitrary and capricious and alleged the PRC discriminated on the basis of race and "failed to carry out University Policy on Equal Opportunity and Affirmative Action." Ex. E (Second Grievance) to Hurwitz Aff. at Bates no. 636–39.

The Faculty Appeals Board ("FAB"), a body comprised of Tenured faculty members appointed by the president of Rutgers, heard the Second Grievance and denied it in its entirety. The FAB concluded the decision of the PRC had a " 'legitimate basis' " in exter-

nal letters and found " 'no evidence' of discrimination or bias." Defendants' Rule 12G Statement at 14 (quoting Hurwitz Aff., ex. F). "The Affirmative Action policy of the University does not guarantee automatic tenure for members of minority groups." Hurwitz Aff., ex. F, at Bates no. 551.

On 11 August 1995, the AAUP filed an action in the Superior Court of New Jersey, Middlesex County, Chancery Division (the "Superior Court"), seeking to vacate or modify the decision of the FAB. *Rutgers Council of AAUP Chapters v. Rutgers, the State University,* No. C–165–95. By order, dated and filed 28 November 1995 (the "Order"), the Superior Court denied the application and dismissed Stewart's claim with prejudice. Ex. H (Order) to Hurwitz Aff.

### 6. *Kelly's Credentials*

Kelly, also a faculty member of the Department, was promoted to associate professor with Tenure during the 1994–95 academic year. Kelly's promotion packet (the "Kelly Promotion Packet") contained evaluations by eight individuals, each a faculty member at a university other than Rutgers. Ex. H (Kelly Promotion Packet) to Ambrose Aff.

A professor and division chair of educational psychology and technology at the University of Southern California indicated he attempted to recruit Kelly to apply for a faculty position at his institution. Ex. H (Kelly Promotion Packet) to Ambrose Aff. at 27. This professor opined that "Kelly's research represents a very significant contribution to the field of learning and instruction" and "resulted in a body of work that is highly original and informs theory and practice in a number of areas." *Id.* He concluded that Kelly "is well on his way to a leadership position in the field of research on learning and instruction" and "would have no hesitation in recommending him for promotion to associate professor at the University of Southern California." *Id.* at 28.

A professor at Texas Christian University described Kelly's work as "first-rate" and ranked him in the top ten percent "nationally and internationally in terms of creativity and productivity," in comparison with similarly-

situated academics. Ex. H (Kelly Promotion Packet) to Ambrose Aff. at 31. A professor and the director for the Center for Improved Engineering and Science Education at Stevens Institute of Technology described Kelly as "exceptionally qualified," adding that, "[c]ompared with others in [the field of computer-based learning systems], both nationally and internationally, Professor Kelly stands out as an outstanding professional." *Id.* at 35.

A professor at Stanford University who served on Kelly's dissertation committee at Stanford described Kelly's work with statistical and computer-based models of student knowledge and learning "as both extremely important and extremely difficult." Ex. H (Kelly Promotion Packet) to Ambrose Aff. at 37. This assessment rated Kelly's work as "excellent" in comparison with similarly situated peers, observing that he had "an impressive number of publications in leading journals." *Id.* at 37–38.

A professor and the director of the Department of Education at the University of California at Irvine described Kelly's record as "extraordinary" and indicated he believed Kelly was much older until he met him following a presentation. Ex. H (Kelly Promotion Packet) to Ambrose Aff. at 40. "Without reservation I recommend Dr. Kelly for promotion to associate professor with tenure. I would like very much to hire him at our institution when the opportunity presents itself." *Id.* A professor at the University of Massachusetts described Kelly as an "impressive scholar" and "a potent and creative intellectual who knows how to apply [his] creativity and power to education in many different ways." *Id.* at 42–43. This professor gave Kelly his "highest recommendation for promotion to associate professor with [T]enure." *Id.* at 43.

An associate professor at the University of Massachusetts indicated he was unfamiliar with Kelly's area of expertise but was "impressed with the amount and quality of his work since the award of his Ph.D. in 1988." Ex. H (Kelly Promotion Packet) to Ambrose Aff. at 46–47. Finally, a program director of research on teaching and learning at the Educational Testing Service rated Kelly's

work highly, ranking him as "one of the very best among his peers." *Id.* at 51. "You'll be lucky to keep him." *Id.* at 52.

### 7. *Smith's Credentials*

Smith, also a faculty member of the Department, was promoted to associate professor with Tenure during the 1994–95 academic year. Smith's promotion packet (the "Smith Promotion Packet") contained evaluations by ten individuals, each a faculty member at a university other than Rutgers. Ex. I (Smith Promotion Packet) to Ambrose Aff.

A professor at the University of Wisconsin gave Smith's work favorable reviews. He concluded, based upon twenty-nine years as a faculty member at the University of Wisconsin, that he would "have no doubt that Michael Smith would be approved for promotion and [T]enure at this university. He'd get my vote; I only wish he were here so that I could cast it." Ex. I (Smith Promotion Packet) to Ambrose Aff. at 22–23.

A professor at Hamilton College opined that Smith had an exemplary breadth of knowledge and "an uncanny ability to delineate the principles and assumptions underlying a given debate...." Ex. I (Smith Promotion Packet) to Ambrose Aff. at 25–26. He discussed in detail Smith's work, and concluded "Rutgers is fortunate to have [Smith]. He has my highest endorsement." *Id.* at 27.

A professor at Harvard University evaluated four of Smith's works and concluded his "scholarship certainly supports promotion to associate professor." Ex. I (Smith Promotion Packet) to Ambrose Aff. at 29. A professor at Rensselaer Polytechnic Institute indicated he was "impressed" with Smith's work, concluding that "Smith's published work, in both its quality and quantity, would, I believe, earn him promotion and [T]enure at my university. I hope it will do so at Rutgers, as well." *Id.* at 31–32. A professor and Director of the Center for Writing and Literacy at the State University of New York at Albany gave Smith's work an excellent review, concluding that Smith "clearly is one of the five most promising scholars in [his] field." *Id.* at 34–35.

A professor at the University of Minnesota gave Smith's work a review commensurate with those summarized. "Given his demonstrated record as someone with national recognition in [his] field, I would strongly recommend that he be granted [T]enure and promotion. I know that he would [be] granted [T]enure at my own institution." Ex. I (Smith Promotion Packet) to Ambrose Aff. at 37–38. A professor at San Diego State University reached similar conclusions, indicating Smith has published work "in the most prestigious research and practitioner journals in our field." *Id.* at 40–41. A professor at the National Reading Research Center, a consortium of the University of Georgia and the University of Maryland, described Smith as "one of the most promising young researchers in the literacy field" and predicted Smith would "emerge as one of the top international leaders in literacy in the next five years." *Id.* at 43–44. Another professor at the same institution echoed the evaluations summarized. "[Smith's] work is solid, well-conceptualized, well-executed, frequently cited, and highly regarded. I am certain that his credentials would merit promotion here at the University of Maryland. We would be proud to have him as a colleague and Associate Professor with [T]enure." *Id.* at 47–48. Finally, a professor at the University of Chicago wrote a comprehensive evaluation commensurate with the above-mentioned evaluations. "I would love to have him at Chicago." *Id.* at 52.

### 8. *Grant Support*

Stewart asserts that the ability of a faculty member to attract grants from sources outside Rutgers provides an objective standard with which to evaluate applications for promotion to Tenure. Opposition Brief at 7. Smith received two grants, for a total of $18,039.00, while an assistant professor at the University of Wisconsin, before he began teaching at Rutgers. Plaintiff's Rule 12G Statement at 10–11. Kelly obtained a total of $623,653.00 in grants. Stewart obtained $13,500.00 in grants "and she was also a participant in another grant application through the University of Illinois." *Id.* at 11.

*Discussion*

### A. *Summary Judgment Standard of Review*

To prevail on a motion for summary judgment, the moving party must establish "there is no *genuine* issue as to any *material fact* and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (emphasis added). The present task is to determine whether disputed issues of fact exist and whether one party is entitled to judgment. A district court, however, may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); *Desvi, Inc. v. Continental Ins. Co.*, 968 F.2d 307, 308 (3d Cir.1992) ("threshold inquiry is whether there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party") (citations and internal quotations omitted). A disputed fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

In considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 847 (3d Cir.1996) (citing *Anderson*, 477 U.S. at 247, 106 S.Ct. at 2509; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)); *Brewer*, 72 F.3d at 330 ("In reviewing the record the court must give the nonmoving party the benefit of all reasonable inferences.") (citations omitted).

Although the summary judgment hurdle is difficult to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has demonstrated the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical

doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original) (citations omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512), *cert. denied,* 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

In *Anderson,* the Supreme Court held "[i]f the evidence [submitted by the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248, 106 S.Ct. at 2510. Stated another way, the standard is whether "reasonable minds could differ as to the import of the evidence...." *Id.* at 250, 106 S.Ct. at 2511; *see also Coolspring Stone Supply, Inc. v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir.1993) (observing that for issue to be considered genuine non-moving party must adduce more than a mere scintilla of evidence in its favor). In addition, when the factual context renders a claim implausible, the non-movant has a heavier burden of production in opposing a motion for summary judgment. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. "Summary judgment may present the district court with an opportunity to dispose of meritless cases and avoid wasteful trials." *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)).

This case presents no disputed issues of material fact. Although Stewart states Rut-

gers has a history of discriminating against African–Americans, Stewart Dep. at 332, she has not presented any evidence in support of this assertion. *See Orson,* 79 F.3d at 1366 (indicating that once movant shows absence of genuine issue for trial, nonmovant may not rest upon mere allegations in pleadings) (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552).

### B. *Statute of Limitations*

 Stewart asserts Defendants discriminated against her because of her race, in violation of 42 U.S.C. § 1981 ("Section 1981") and 42 U.S.C. § 1983 ("Section 1983"). Complaint, ¶¶ 25, 27. Because Sections 1981 and 1983 do not contain their own statutes of limitations, courts look to the forum state's statute of limitations for personal injury torts. *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660–62, 107 S.Ct. 2617, 2620–22, 96 L.Ed.2d 572 (1987); *Wilson v. Garcia,* 471 U.S. 261, 276, 105 S.Ct. 1938, 1947, 85 L.Ed.2d 254 (1985); *Genty v. Resolution Trust Corp.,* 937 F.2d 899, 919 (3d Cir.1991). A Federal court sitting in the State of New Jersey applies New Jersey's two-year limitations period to actions brought pursuant to Sections 1981 and 1983. *Genty,* 937 F.2d at 919 (citing N.J.S.A. § 2A:14–2; *Cito v. Bridgewater Tp. Police Dep't.,* 892 F.2d 23, 25 (3d Cir.1989)); *Napier v. Thirty or More Unidentified Federal Agents,* 855 F.2d 1080, 1087 (3d Cir.1988). In an employment discrimination case, the limitations period begins to run on the date the allegedly discriminatory acts occurred. *Delaware State College v. Ricks,* 449 U.S. 250, 258–59, 101 S.Ct. 498, 504–05, 66 L.Ed.2d 431 (1980).

 Stewart filed the Complaint on 18 August 1995. Defendants assert the Complaint is time-barred because the limitations period began to run when Stewart was first notified she was denied Tenure, on 2 April 1993. Moving Brief at 2–3; Reply Brief at 2. Stewart was also notified that she was denied Tenure by letter, dated 13 June 1995. Defendants' Rule 12G Statement at 14 (citing Hurwitz Aff., ex. D). Accordingly, the decision of the Defendants to deny Stewart ten-

ure is within the two-year limitations period of N.J.S.A. § 2A:14–2.

Stewart argues evidence related to the decision to deny her Tenure in 1993 should also be considered because the relevant conduct amounts to a continuing violation. Opposition Brief at 13 (citing *Ricks,* 449 U.S. 250, 101 S.Ct. 498). A statute of limitations is subject to equitable exceptions. One such exception is the continuing violation theory. Under that theory, evidence of discriminatory conduct occurring prior to the limitations period is admissible if a plaintiff can demonstrate that "the act is part of an ongoing practice or pattern of discrimination of the defendant." *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 754 (3d Cir.1995) (citing *Bronze Shields, Inc. v. New Jersey Dep't. of Civ. Serv.,* 667 F.2d 1074, 1081 (3d Cir.1981), *cert. denied,* 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982); *Jewett v. International Tel. & Tel. Corp.,* 653 F.2d 89, 91 (3d Cir.), *cert. denied,* 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981)).

The continuing violation theory has two prerequisites. First, a plaintiff must allege that at least one act occurred within the statutory period. *West,* 45 F.3d at 754–55 (citing *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977)). Stewart has met that requirement here because she has alleged discriminatory acts by Defendants in 1995, which occurred well within the two-year period immediately preceding the filing of the Complaint. To apply the continuing violation theory, a plaintiff must also establish that the alleged wrongful acts are not merely sporadic or isolated. "The relevant distinction is between the occurrence of isolated, intermittent acts of discrimination and a persistent, on-going pattern." *Id.* at 755 (footnote omitted). Stewart has not met the second requirement.

The acts alleged in this case are isolated incidents: Seneca authored the 29 March 1993 Letter; shortly thereafter, Lawrence recommended that the Board deny Stewart tenure. Seneca also authored the 17 May 1995 Letter; shortly thereafter, Lawrence recommended that the Board deny Stewart tenure. Only the latter two acts fall within the two-year limitations period of N.J.S.A. § 2A:14–2. Accordingly, a cause of action based upon the former two acts is time-barred. *See West,* 45 F.3d at 755. As indicated below, however, even if the first two acts are considered, the Motion for Summary Judgment must be granted.

C. *Section 1981 of Title 42*

Stewart first alleges Defendants are liable for racial discrimination pursuant to Section 1981. Complaint, ¶¶ 24–25. Section 1981, which prohibits racial discrimination in the making and enforcement of private contracts, provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. § 1981(a). Section 1981 further provides "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c).

Although Section 1981 once was limited to racial discrimination arising out of the making and enforcing of contracts, *see Bermingham v. Sony Corp. of Am., Inc.,* 820 F.Supp. 834, 848 (D.N.J.1992) (citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 185, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989)), *aff'd,* 37 F.3d 1485 (3d Cir.1994), the Civil Rights Act of 1991 extended the reach of the statute to discrimination occurring after the formation of a contract, "including the modification and termination of contracts and the enjoyment of all terms and conditions of the contractual relationship." *Id.* (citing 42 U.S.C. § 1981(b)).

In this case, the Complaint alleges Defendants wrongfully withheld Tenure from Stewart, which is essentially a lifetime employment contract. *See Hennessey v. National Collegiate Athletic Ass'n,* 564 F.2d 1136, 1142 (5th Cir.1977). Accordingly, the activity alleged concerns interference with contract within the scope of Section 1981. *See Runyon v. McCrary,* 427 U.S. 160, 172–

73, 96 S.Ct. 2586, 2595–96, 49 L.Ed.2d 415 (1976); *Roebuck v. Drexel Univ.,* 852 F.2d 715, 725 (3d Cir.1988); *Bermingham,* 820 F.Supp. at 848.

▪ A plaintiff seeking recovery for employment discrimination pursuant to Section 1981 may prove a claim by way of either direct or circumstantial evidence. *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983); *Kralman v. Illinois Dep't of Veterans' Affairs,* 23 F.3d 150, 153 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 359, 130 L.Ed.2d 313 (1994).[6] "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of the fact [in issue] *without inference or presumption." Torre v. Casio, Inc.,* 42 F.3d 825, 829 (3d Cir.1994) (emphasis in original) (citations and internal quotations omitted).

Stewart has not cited any direct evidence to support her claim of racial discrimination by Defendants and a review of the facts reveals no such evidence. *Compare Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 120, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985) (policy of defendant airline was direct evidence of discrimination, where policy permitted pilots disqualified for any reason but age to transfer automatically to position of flight engineer, although age-disqualified pilots were required to bid for available flight engineer positions and retire if bids were unsuccessful before their sixtieth birthdays).

In the absence of direct evidence, a plaintiff may establish a *prima facie* case of racial discrimination by way of circumstantial evidence. *Torre,* 42 F.3d at 829 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). In *McDonnell Douglas,* the Court set out a four-part framework for a plaintiff seeking to raise an inference of discrimination. 411 U.S. at 802, 93 S.Ct. at 1824.

▪ Under *McDonnell Douglas,* a employee must first demonstrate a *prima facie* case of discrimination by preponderance of the evidence. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993) (citing *Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981)); *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994); *Bennun,* 941 F.2d at 170. Once established, a *prima facie* case creates a presumption of discriminatory intent by the defendant-employer. *Hicks,* 509 U.S. at 506, 113 S.Ct. at 2746 (citing *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094); *Bennun,* 941 F.2d at 170. At this stage, the *McDonnell Douglas* presumption places a burden upon the defendant to produce evidence that the adverse employment actions were taken " 'for a legitimate, nondiscriminatory reason.' " *Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094). "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094. The asserted reasons must support a finding, should a jury credit them as accurate, that unlawful discrimination was not the cause of the adverse employment action. *Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747. At this stage, "the defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions." *Burdine,* 450 U.S. at 260, 101 S.Ct. at 1097 (rejecting lower court decision holding defendant to a preponderance-of-evidence standard at this stage of the proceedings).

▪ Once the employer satisfies this burden, the presumption raised by the *prima facie* case is "rebutted" and "drops from the case." *Burdine,* 450 U.S. at 255 & n. 10, 101 S.Ct. at 1094 & n. 10; *see Hicks,* 509 U.S. at 509–11, 113 S.Ct. at 2748–49 (holding that jury's rejection of defendants' proffered rea-

---

**6.** Although *Aikens* concerned a claim under Title VII of the Civil Rights act of 1964, 42 U.S.C. §§ 2000e–2000e–15, and *Kralman* concerned a claim under the Age Discrimination in Employment Act, 29 U.S.C. § 621–34, the evidentiary standards set out in Title VII and ADEA cases are routinely applied to Section 1981 cases. *Patter-*

*son,* 491 U.S. at 186, 109 S.Ct. at 2377; *Weldon v. Kraft, Inc.,* 896 F.2d 793, 796 (3d Cir.1990); *Roebuck,* 852 F.2d at 726 (citing *Lewis v. University of Pittsburgh,* 725 F.2d 910, 914–16 (3d Cir. 1983), *cert. denied,* 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984)).

sons does not compel judgment as a matter of law in favor of plaintiff); *Torre,* 42 F.3d at 829 (indicating that, to rebut a *prima facie* case, a defendant must articulate " 'a legitimate, non-discriminatory reason for its actions' ") (quoting *McKenna v. Pacific Rail Serv.,* 32 F.3d 820, 825 (3d Cir.1994)). A plaintiff-employee must then prove "that the employer's proffered reasons [for terminating an employee][7] are pretextual." *Id.* at 829; *see Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747 (observing that under the *McDonnell Douglas* framework, the ultimate burden of persuasion remains with the plaintiff).

■ Once a plaintiff points to evidence sufficient to discredit a defendant's proffered reasons, the plaintiff need not also come forward with additional evidence of discrimination beyond his or her *prima facie* case to survive a summary judgment motion by the defendant. *Waldron v. SL Indus., Inc.,* 56 F.3d 491, 495 (3d Cir.1995); *Fuentes,* 32 F.3d at 764 ("to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered nondiscriminatory reasons ... was either a *post hoc* fabrication or otherwise did not actually motivate the employment action") (emphasis in original).

### 1. Stewart Has Established a Prima Facie Case

■ Stewart may establish a *prima facie* case by demonstrating by a preponderance of the evidence that she is within a protected class; that she applied for, was qualified for and was rejected for the position she sought and that non-members of the protected class were treated more favorably. *Bennun,* 941 F.2d at 170 (citing *Roebuck,* 852 F.2d 715); *Kunda v. Muhlenberg Coll.,* 621 F.2d 532, 541 (3d Cir.1980). "The nature of the required showing to establish a *prima facie* case of disparate treatment by indirect evidence depends on the circumstances of the case." *Torre,* 42 F.3d at 830. In this case,

the Defendants have conceded the existence of a *prima facie* case. Reply Brief at 5.

The facts indicate Stewart has met the standard previously established by the Circuit for establishing a *prima facie* case in these circumstances:

> [I]n order to satisfy the qualifications element of [a *prima facie* case], plaintiff "need only show that [she] was sufficiently qualified to be among those persons from whom a selection, to some extent discretionary, would be made. That is, [she] need show only that [her] qualifications were at least sufficient to place [her] in the middle group of tenure candidates as to whom both a decision granting tenure and a decision denying tenure could be justified as a reasonable exercise of discretion by the tenure-decision making body."

*Bennun,* 941 F.2d at 176 (quoting *Roebuck,* 852 F.2d at 726 (quoting *Banerjee v. Board of Trustees,* 648 F.2d 61, 63 (1st Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981))). Under this standard, Stewart has established a *prima facie* case.

Stewart, an African–American, was rejected for a position as an associate professor with Tenure, whereas Smith and Kelly, who are caucasian, were granted Tenure status. Stewart, whom the Department unanimously recommended for Tenure, established she is at least in the "middle group" of Tenure candidates. *Bennun,* 941 F.2d at 176. Under the permissive *McDonnell Douglas* standard, she has established a *prima facie* case of racial discrimination.

### 2. Defendants Provided Legitimate, Non–Discriminatory Reasons for Denying Stewart Tenure

■ Granting Stewart the benefit of all favorable inferences, the record indicates Stewart's credentials were strong. However, the credentials of Smith and Kelly are objectively significantly stronger. Smith and Kelly published more material in journals considered by outside evaluators as "top-tier." They each had been awarded more funds

---

7. Although *Torre* concerned an allegedly discriminatory discharge of an employee, the same standard applies to cases in which a plaintiff alleges a failure to promote was the product of discrimi-

natory animus. *Fuentes,* 32 F.3d at 759; *Bennun,* 941 F.2d at 170–71; *Roebuck,* 852 F.2d at 726.

than Stewart. However, although Stewart argues an objective standard should be applied to compare her credentials with those of Kelly and Smith, Opposition Brief at 8 (citing *Bennun*, 941 F.2d 154), a subjective evaluation is appropriate.

The *Bennun* decision applied an objective standard to affirm the trial court's conclusion that Rutgers was liable for discrimination in denying a promotion to an associate professor. *Bennun*, 941 F.2d at 178–79. In *Bennun*, the defendant determined that the plaintiff had been "moderately active" in publishing, whereas the a colleague who was promoted was determined "excellent in quantity," and the colleague had published less material. *Id.* at 159. The *Bennun* plaintiff was required to become "an international leader" to be promoted; his colleague was not. Rutgers considered the *Bennun* plaintiff's grant support as a negative factor; the grant support of his colleague was not considered at all. *Id.*

In this case, however, the Defendants determined that the scholarship of Stewart "is limited and has not been recognized by significant peer-reviewed support, nor has it demonstrated substantial national impact on developments in her field." Ex. G (Stewart 1994–95 Promotion Packet) to Ambrose Aff. at Bates no. 101. Perhaps the Defendants would have preferred a candidate who published in more "top-tier" journals. Perhaps the Defendants concluded the authors of Stewart's evaluations were not as known as others. It is inappropriate to speculate. "We have cautioned courts on several occasions to avoid unnecessary intrusion into subjective promotion decisions in the analogous context of academic tenure." *Ezold v. Wolf, Block, Schorr and Solis–Cohen*, 983 F.2d 509, 527 (3d Cir.1992), *cert. denied*, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993). Because the Defendants have proffered legitimate non-discriminatory reasons for denying Tenure to Stewart, the *McDonnell Douglas* presumption drops from the case.

3. *Stewart Has Failed to Submit Evidence or an Explanation to Show that Grounds Defendants Provided for Denying Her Tenure are Pretextual*

At the "pretext" stage of the *McDonnell Douglas* analysis, Stewart must show discriminatory animus by Defendants by a preponderance of the evidence. *Fuentes*, 32 F.3d at 763. The Circuit stated:

> To discredit the employer's proffered reason [for discharging an employee], ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the ... plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

*Id.* at 765 (emphasis in original) (citations omitted).

Actual evidence of discrimination is not needed to prove pretext; proof that the defendant did not act for the stated reasons is sufficient. *Fuentes*, 32 F.3d at 765. A plaintiff may establish pretext in one of two ways. A plaintiff may directly establish pretext " 'by persuading the court that a discriminatory reason more likely motivated the employer.' " *Ezold*, 983 F.2d at 523 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095). In the alternative, a plaintiff may establish pretext by showing the employer's proffered reason for its decision is " 'unworthy of credence.' " *Id.* (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095). Although a plaintiff must show that the employer's proffered reasons are not worthy of credence to survive summary judgment, the plaintiff need not also demonstrate that the employer was actually motivated by discriminatory animus. *Waldron*, 56 F.3d at 494–95 (observing that, under *Hicks* and *Fuentes* a plaintiff survives summary judgment by demonstrating a *prima facie* case and that the defendant's proffered reasons are not credible); *see Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir.) (holding pretext is not demonstrated simply by showing employer

was mistaken in its decision; there must be evidence of inconsistencies and anomalies that could support inference that employer did not act for stated reasons), *cert. denied,* —— U.S. ——, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995).

Stewart has presented no pretext evidence to support her claim. The Grievance Committee evaluated the facts and likewise found no discrimination. The submissions indicate that, historically, Rutgers has denied Tenure to one-third of all Tenure candidates. Defendants' Rule 12G Statement at 2 n. 3 (citing Ambrose Aff., ¶ 3). The submissions indicate the Tenure evaluation process is necessarily subjective, and there is no indication that the decision to deny Stewart Tenure was prompted by discriminatory animus. " '[M]ore than a denial of promotion as a result of a dispute over qualifications' must be shown to prove pretext." *Bennun,* 941 F.2d at 170 (citing *Molthan v. Temple Univ.,* 778 F.2d 955, 962 (3d Cir.1985)); *cf. Ezold,* 983 F.2d at 527. Summary judgment in favor of the Defendants on the Section 1981 claim is proper.

### D. *Equal Protection Claim*

 The Fourteenth Amendment to the United States Constitution provides in relevant part: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause is directed at classifications that accord disparate treatment to different groups of people. *See, e.g., City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 448–50, 105 S.Ct. 3249, 3258–60, 87 L.Ed.2d 313 (1985) (holding denial of permit for proposed group home for the mentally retarded violated Equal Protection clause). "When presented with an [E]qual [P]rotection challenge the first duty of the court is to determine what classifications have been created. . . ." *Contractors Ass'n of Eastern Penn. v. City of Phila.,* 945 F.2d 1260, 1268 (3d Cir.1991) (Higginbotham, J., concurring).

 The Supreme Court traditionally has assigned varying levels of scrutiny to different types of categorizations. *See, e.g., Plyler v. Doe,* 457 U.S. 202, 216–24, 102 S.Ct. 2382, 2394–98, 72 L.Ed.2d 786 (holding there is no rational basis for denying free public education to school-age illegal aliens), *reh'g denied,* 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401 (1982); *Cleburne,* 473 U.S. at 440–41, 105 S.Ct. at 3254–55 (holding gender-based distinctions "call for a heightened standard of review") (citing *Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973)); *id.* at 440, 105 S.Ct. at 3254 (holding classifications based upon race "are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest") (citing *McLaughlin v. Florida,* 379 U.S. 184, 192, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964)). These considerations are inappropriate in this case because Stewart has not provided a hint of racially-motivated animus in the decision of the Defendants to deny her Tenure. One-third of Tenure applicants have been unsuccessful in the past. The submissions do not establish there was a racially-based motivation in the decision to deny Stewart Tenure. Although Stewart has alleged discriminatory animus, Complaint, ¶¶ 25, 27 and stated Rutgers has a history of denying Tenure to African–Americans, she has not included any evidence to support this allegation.[8] Summary judgment in favor of the Defendants on the Equal Protection claim is appropriate.

### *Conclusion*

For the reasons stated, the Motion for Summary Judgment is granted.

---

**8.** Stewart stated: "Historically the university has turned down minority professors for [T]enure. . . . Also, in the Department of Learning and Teaching, for at least the last 20 years there has not been a black minority, African American [T]enured in that department." Stewart Dep. at 332.